# 22-3094-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

JEAN ROBERT SAINT-JEAN, EDITH SAINT-JEAN, FELEX SAINTIL, LINDA COMMODORE, BEVERLEY SMALL, YANICK SAINTIL, JEANETTE SMALL, FELIPE HOWELL, JR., AS ADMINISTRATOR OF THE ESTATE OF FELIPE R. HOWELL, *Plaintiffs-Appellees*,

FELIPE HOWELL, *Plaintiff*,

v.

EMIGRANT MORTGAGE COMPANY, INC. AND EMIGRANT BANK, *Defendants-Appellants*,

EMIGRANT SAVINGS BANK-MANHATTAN, EMIGRANT BANCORP, INC., *Defendants*.

ON APPEAL FROM A FINAL JUDGMENT ENTERED ON NOVEMBER 16, 2022 BY THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK 11-CV-2122, THE HONORABLE MARGO K. BRODIE

## PAGE PROOF BRIEF FOR DEFENDANTS-APPELLANTS

EVANDRO C. GIGANTE
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10026
(212) 969-3000

RICHARD H. KLAPPER
MATTHEW A. SCHWARTZ
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Attorneys for Defendants-Appellants*
*Emigrant Mortgage Company, Inc. and Emigrant Bank*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants Emigrant Mortgage Company, Inc. and Emigrant Bank (together, "Emigrant") state that:

(1) Emigrant Mortgage Company, Inc. is a wholly-owned subsidiary of Emigrant Credit Corporation ("ECC"). ECC is a wholly owned subsidiary of Emigrant Bank.

(2) Emigrant Bank is a wholly owned subsidiary of Emigrant Bancorp, Inc. ("EBI"). EBI is a wholly-owned subsidiary of New York Private Bank & Trust Corporation. New York Private Bank & Trust Corporation is not a publicly traded corporation, and no publicly traded corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

*Page*

STATEMENT OF JURISDICTION ................................................................ 1

ISSUES PRESENTED FOR REVIEW ......................................................... 2

STATEMENT OF THE CASE ....................................................................... 3

      A.     The Parties and the STAR NINA Loan Program ....................... 6

      B.     Plaintiffs' Claims ................................................................... 11

      C.     Emigrant's Motion to Dismiss ................................................ 12

      D.     Emigrant's Motion for Summary Judgment ............................ 13

      E.     The 2016 Trial ...................................................................... 14

      F.     Emigrant's Motion for Judgment as a Matter of Law or a New Trial ............................................................................. 19

      G.     The 2019 Trial and Subsequent Proceedings ......................... 22

STANDARD OF REVIEW ......................................................................... 23

SUMMARY OF ARGUMENT ................................................................... 24

ARGUMENT .............................................................................................. 27

    I.     The District Court Erred in Concluding that Plaintiffs-Appellees' Claims Were Timely ........................................................................ 27

      A.     The District Court Erred in Finding that the Discovery Rule Rendered Plaintiffs' Claims Timely ............................... 28

      B.     The District Court Erred in Finding that Plaintiffs' Claims Were Salvaged by Equitable Tolling ....................................... 32

    II.    The District Court Committed Reversible Error in Its Jury Instructions ............................................................................. 41

A.    The District Court Erred in Its Jury Instruction on
      Disparate Impact Discrimination ...............................................42

B.    The District Court Also Erred in Its Jury Instructions on
      Intentional Discrimination ........................................................49

III.  The District Court Erred in Finding that the Release Agreement
      Signed by the Saintils was Unenforceable as Against
      Public Policy...........................................................................52

**CONCLUSION**................................................................................54

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*ABKCO Music, Inc.* v. *Harrisongs Music, Ltd.*,
 722 F.2d 988 (2d Cir. 1983) ...................................................................53

*Anderson* v. *Branen*,
 17 F.3d 552 (2d Cir. 1994) ....................................................................41

*Anita Founds., Inc.* v. *ILGWU Nat. Ret. Fund*,
 902 F.2d 185 (2d Cir. 1990) .............................................................26, 53

*Aponte* v. *Kanbur*,
 2021 WL 3854069 (2d Cir. Aug. 30, 2021) ..........................................42

*Boyce* v. *Soundview Tech. Grp., Inc.*,
 464 F.3d 376 (2d Cir. 2006) ..................................................................23

*Boyd* v. *Lefrak Org.*,
 509 F.2d 1110 (2d Cir. 1975) .................................................................48

*City of Pontiac Gen. Employees' Ret. Sys.* v. *MBIA, Inc.*,
 637 F.3d 169 (2d Cir. 2011) ..................................................................29

*Clark* v. *Chase Bank USA, N.A.*,
 643 Fed. App'x 838 (11th Cir. 2016) .....................................................35

*Clement* v. *United Homes, LLC*,
 914 F. Supp. 2d 362 (E.D.N.Y. 2012) .............................28, 29, 30, 31

*Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Solutions, LLC*,
 478 F. Supp. 3d 259 (D. Conn. 2020)....................................................46

*Corcoran* v. *N.Y. Power Auth.*,
 202 F.3d 530 (2d Cir. 1999) ..................................................................29

*Davenport* v. *Litton Loan Servicing, LP*,
 725 F. Supp. 2d 862 (N.D. Cal. 2010)....................................................27

*Doe* v. *Menefee*,
 391 F.3d 147 (2d Cir. 2004) ..................................................................32

iv

*Fair Housing Justice Ctr., Inc.* v. *Lighthouse Living LLC*,
  2021 WL 4267695 (S.D.N.Y. Sept. 20, 2021) ...................................................12

*Francis* v. *Kings Park Manor, Inc.*,
  992 F.3d 67 (2d Cir. 2021) ..............................................................................50

*Grimes* v. *Fremont Gen. Corp.*,
  785 F. Supp. 2d 269 (S.D.N.Y. 2011) ........................................................27, 39

*Guilbert* v. *Gardner*,
  480 F.3d 140 (2d Cir. 2007) .............................................................................28

*Hales* v. *HSBC Bank U.S.A., N.A.*,
  347 F. App'x 698 (2d Cir. 2009) ......................................................................28

*Humphrey* v. *Citibank NA*,
  2013 WL 5407195 (N.D. Miss. Sept. 25, 2013) ...............................................27

*In re Johnson*,
  2014 WL 4197001 (E.D.N.Y. Aug. 22, 2014) ..................................................12

*Koch* v. *Christie's Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012) .............................................................................29

*Merck & Co.* v. *Reynolds*,
  559 U.S. 633 (2010)..........................................................................................29

*Mhany Mgmt., Inc.* v. *Cty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ......................................................................*passim*

*Morris* v. *Broadridge Fin. Servs., Inc.*,
  2010 WL 5187669 (E.D.N.Y. Dec. 14, 2010)...................................................30

*Morse* v. *Fusto*,
  804 F.3d 538 (2d Cir. 2015) .............................................................................42

*Muschany* v. *U.S.*,
  324 U.S. 49 (1945)............................................................................................52

*New York City Env't'l Justice All.* v. *Giuliani*,
  214 F.3d 65 (2d Cir. 2000) ...............................................................................47

*New York* v. *Hendrickson Bros., Inc.*,
840 F.2d 1065 (2d Cir. 1988) ...............................................................32, 33, 37

*Pantoja* v. *Scott*,
2001 WL 1313358 (S.D.N.Y. Oct. 26, 2001)....................................................27

*Patel* v. *Searles*,
305 F.3d 130 (2d Cir. 2002) ...............................................................................23

*Pearl* v. *City of Long Beach*,
296 F.3d 76 (2d Cir. 2002) ........................................................................32, 41

*Quad Enters. Co., LLC* v. *Town of Southold*,
369 F. App'x 202 (2d Cir. 2010) .......................................................................50

*Rasanen* v. *Doe*,
723 F.3d 325 (2d Cir. 2013) ...............................................................................42

*Riccardo* v. *NYC Dept. of Educ.*,
2016 WL 7106048 (S.D.N.Y. Dec. 2, 2016) ....................................................12

*Ricci* v. *DeStefano*,
557 U.S. 557 (2009)...........................................................................................42

*Riley* v. *Brook*,
667 Fed. App'x 12 (2d Cir. 2016) ....................................................................23

*Rockmore* v. *Antell*,
2008 WL 4443951 (S.D.N.Y. Sept. 25, 2008) .................................................53

*Rotella* v. *Wood*,
528 U.S. 549 (2000)...........................................................................................29

*Texas Dept. of Housing and Cmty. Affairs* v. *Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015)....................................................................................*passim*

*Thomas James Assocs.* v. *Jameson*,
102 F.3d 60 (2d Cir. 1996) ...............................................................................52

*Thompson* v. *Metro. Life Ins. Co.*,
149 F. Supp. 2d 38 (S.D.N.Y. 2001) ................................................................28

vi

*Tsombanidis* v. *W. Haven Fire Dep't*,
   352 F.3d 565 (2d Cir. 2003) ..........................................................43, 45

*U.S.* v. *Twenty Miljam-350 IED Jammers*,
   669 F.3d 78 (2d Cir. 2011) ................................................................23

*Veltri* v. *Building Service 32B-J Pension Fund*,
   393 F.3d 318 (2d Cir. 2004) ..............................................................41

*Village of Arlington Heights* v. *Met. Housing Dev. Corp.*,
   429 U.S. 252 (1977)...........................................................18, 19, 50

*Walker* v. *Jastremski*,
   430 F.3d 560 (2d Cir. 2005) ..............................................................32

*Warren* v. *Pataki*,
   823 F.3d 125 (2d Cir. 2016) ..............................................................23

## Statutes and Regulations

15 U.S.C. § 1691 ....................................................................................1

42 U.S.C. § 3604....................................................................................1

42 U.S.C. § 3605....................................................................................1

NYC Admin. Code § 8.............................................................................1

## Other Authorities

Black's Law Dictionary (11th ed. 2019) .................................................43

Leonard B. Sand, et al., *Modern Federal Jury Instructions* § 87-33.......................45

## STATEMENT OF JURISDICTION

This case arises under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, 3605 *et seq.*, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), Title 8, NYC Admin. Code. The District Court[1] had jurisdiction under 42 U.S.C. § 1331 and 28 U.S.C. § 1367.

This is an appeal from the District Court's November 16, 2022 Judgment ("Judgment"), as well as all orders leading to that Judgment. (Dkt. 780.) Emigrant filed its Notice of Appeal on December 6, 2022. (Dkt. 781.) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1]  Judge Sterling Johnson presided until his passing on October 10, 2022, at which time the case was reassigned to Chief Judge Margot K. Brodie. (Oct. 13, 2022 Dkt. Entry.)

## ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in concluding that Plaintiffs' claims were timely despite being brought after the expiration of the applicable statute of limitations periods, on the ground that Plaintiffs allegedly did not learn about their claims until "meeting with [their] counsel"?

2.    Did the District Court err in its instructions to the jury on disparate impact discrimination by relieving Plaintiffs of their burden to prove required elements of disparate impact discrimination, including that any impact must have been *disproportionately* adverse to African-American borrowers as compared to other borrowers?

3.    Did the District Court err in its instructions to the jury on intentional discrimination by relieving Plaintiffs of their burden to prove that Emigrant acted with racial animus?

4.    Did the District Court err in concluding that the release agreement knowingly and voluntarily signed by plaintiffs Felex Saintil and Yanick Saintil was unenforceable as against public policy?

## STATEMENT OF THE CASE

Between 1999 and 2008, Emigrant Mortgage Company and its parent, Emigrant Bank (together, "Emigrant"), offered the STAR NINA ("no income, no asset") loan program to provide loans to borrowers with low credit. In 2016, on the basis of seriously flawed jury instructions, a jury found the STAR NINA program to be discriminatory against African-American borrowers and, consequently, found Emigrant liable for $950,000 in compensatory damages for violations of the FHA, ECOA, and NYCHRL, but awarded no punitive damages. Following a 2019 retrial on damages—which the District Court ordered *sua sponte* based on its view that the prior jury's award was too low—a second jury ordered Emigrant to pay the lower amount of $722,048 in compensatory damages. Again, no punitive damages were awarded. Emigrant now appeals on the basis that the District Court committed a series of distinct errors, each of which justifies either reversing the judgment in its entirety or vacating it.

*First*, Plaintiffs' claims were brought after the applicable two- and three-year statutes of limitations. The District Court nevertheless held that Plaintiffs' claims were timely under a fundamental misapplication of the discovery rule and equitable tolling doctrine. In applying these doctrines, the District Court improperly ignored that Plaintiffs were indisputably aware of their alleged injuries more than three years prior to bringing their claims, having plainly understood the

terms of the STAR NINA loans at the time of closing. Under established law, knowledge of these alleged injuries—not knowledge of all the underlying facts— was all that was needed to trigger the statute of limitations for the claims at issue in this case. Moreover, the District Court's ruling that mortgage discrimination is "inherently self-concealing" such that Plaintiffs could not have discovered the discrimination element of their claims until they were approached by their counsel ignores settled law concerning these doctrines and effectively eviscerates any statute of limitations for mortgage discrimination cases. The District Court's Judgment should thus be reversed in its entirety on this ground.

*Second*, after the District Court insisted on providing the jury with a general verdict form—which prevented the jury from identifying the basis, if any, on which it found Emigrant liable—the District Court erred in its instructions to the jury on both theories of liability advanced by Plaintiffs: disparate impact and intentional discrimination. As to disparate impact, the District Court instructed the jury—over Emigrant's objection—to find Emigrant liable if Plaintiffs proved that STAR NINA loans "had a substantial adverse impact on African-American or Hispanic borrowers." (Dkt. 522 at 35.) But this is not the standard for proving disparate impact, as Plaintiffs were required to show not only that STAR NINA loans were bad for African-American borrowers, but also that they were *disproportionately* bad for African-American borrowers compared to other

-4-

borrowers.  The District Court's failure to instruct the jury as to the *comparative* element of disparate impact was particularly glaring, as even Plaintiffs' proposed instructions explicitly stated that Emigrant could only be held liable if the jury found that STAR NINA loans "had a *disproportionate* effect on African Americans." (Dkt. 486 at 4 (emphasis added).)  The omission is made worse by the fact that Plaintiffs' own expert testified that the STAR NINA loans were "not . . . disproportionately bad for minorities," but instead were "bad for everyone." (Ayres Tr. 372:8–10; *see also* Courchane Tr. 2832:5–9.)[2]  The evidence also established that the majority of STAR NINA borrowers were white.  (Ex. F-7 at 2; Ex. 262; Courchane Tr. 2792:21–2793:4, 2810:5–7.)

The District Court's instruction on disparate impact was further flawed in that it (i) did not instruct the jury that Plaintiffs had the "burden of proving an *available* alternative practice that ha[d] less disparate impact and serve[d] [Emigrant's] legitimate nondiscriminatory interests," *Mhany Mgmt., Inc.* v. *Cty. of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016) (emphasis added); and (ii) did not instruct the jury that Plaintiffs were required to establish a "robust" causal link between the challenged policy or practice and the alleged disparate impact, *Texas Dept. of*

---

[2]     Unless otherwise indicated, references to "Tr." and "Ex." are to the trial transcripts and exhibits from the 2016 trial, which took place between May 23, 2016 and June 27, 2016.

*Housing and Cmty. Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015).

The District Court also erred in its instruction on intentional discrimination by telling the jury that Plaintiffs were "not required to show that [Emigrant] acted with racial animus," which is precisely the opposite of this Court's statement that "establishing a prima facie case of disparate treatment" requires a "showing that *animus* against the protected group was a *significant factor*" in the decision-making process. *Mhany Mgmt.*, 819 F.3d at 606 (emphasis added).

Because of these erroneous jury instructions, the District Court's Judgment should be vacated.

*Third*, and finally, the District Court erred in improperly overturning the jury's finding that Plaintiffs Felex and Yanick Saintil knowingly and voluntarily released their claims against Emigrant as part of a loan modification agreement they entered into in 2010. Contrary to the District Court's holding, the Saintils' release agreement did not contravene "public policy," but instead furthered the well-settled public policy in favor of settling disputes. The District Court's Judgment should thus be reversed as to the Saintils.

## A.    The Parties and the STAR NINA Loan Program

Emigrant is a community bank and mortgage lender. Beginning in 1999, as part of its mortgage offerings, Emigrant offered the STAR NINA loan

program in response to demand for loan products that did not require applicants to disclose income or assets. (Woolsey Tr. 2258:25–2259:25.) STAR NINA loans were available to borrowers with credit scores of 600 or below and provided an opportunity for homeowners unable to qualify for other loans to refinance their existing mortgages, many of which were on the verge of foreclosure. (*Id.*; Woolsey Tr. 2263:20–2264:14; Wald Tr. 2007:1–3.) To help incentivize borrowers to remain current on their mortgage payments, STAR NINA loans included a default interest provision, which was generally triggered upon a thirty-day default and imposed an 18-percent default interest rate. (Woolsey Tr. 2262:24–2264:1; Tang Tr. 2609:20–25.) The purpose of this 18-percent default rate was to encourage borrowers to repay their loans, while charging a rate that "was far lower than what credit cards were charging." (Woolsey Tr. 2263:9–2264:1.) These standard terms were used in all STAR NINA loan transactions, regardless of the borrower's race. (Malek Tr. 2230:8–11; Woolsey Tr. 2265:13–15, 2266:5–8.) The majority of STAR NINA loans were made to white borrowers. (Courchane Tr. 2792:21–2793:4, 2810:5–7.) For instance, between 2004 and 2006, the period during which a number of Plaintiffs closed on their loans, white borrowers received 1,720 STAR NINA loans, compared to only 709 loans to African-American borrowers (Ex. 262), and in 2004, white borrowers made up a total of 58 percent of the STAR NINA portfolio, compared to

only 17 percent for African-American borrowers (Ex. F-7 at 2). Emigrant terminated the STAR NINA program in November 2008. (Wald Tr. 2013:24–25.)

Plaintiffs are eight African Americans[3] who received STAR NINA loans. Between 2004 and 2008, Plaintiffs secured loans of between $125,000 and $370,000 to refinance their existing mortgages at interest rates between 8.75 and 11.75 percent. (Exs. A-6, A-17, B-15, K-28, X-28; Walzak Tr. 80:11–14.) Plaintiffs were assisted by brokers they selected based on personal contacts or referrals.[4] Consistent with STAR NINA's standard policies, each of Plaintiffs' loans contained a 30-day default clause, upon which the interest rate increased to 18 percent. (Tang Tr. 2609:20–25.)

Emigrant granted the STAR NINA loans to Plaintiffs based on their credit score (below 600) and the ratio of the loan amount to the equity they had in their properties. (Emerson Tr. 2309:13–2311:16, 2314:5–2317:12.) Although the loans did not require income or asset verification, Plaintiffs were given Resource

---

[3]     Following Mr. Felipe Howell's passing on May 1, 2020, the Administrator of Mr. Howell's Estate was substituted as a Plaintiff in this action. (Dkt. 770.)

[4]     (*See* Walzak Tr. 160:7–25; Howell Tr. 233:11–18, 295:11–297:15; F. Saintil Tr. 691:11–695:7; B. Small Tr. 1073:3–15, 1076:7–18, 1105:7–1106:9; E. Saint-Jean Tr. 1366:20–1367-24, 1407:2–1408:25, 1413:7–1416:15; J. Saint-Jean Tr. 1524:24–1525:16; Commodore Tr. 1716:2–1719:11.)

Letters stating the cost of the loan and the level of income needed to repay it.[5] (Exs. W-29 (Saint-Jeans), F-15 (Saintils), A-17 (Smalls), L-6 (Commodore), L-31 (Howell).) These Resource Letters were not required by law, but were "voluntarily provided" by Emigrant "to ensure that the applicant was fully informed of the loan terms," "the loan amount that they were approved for, the payment associated with the loan," and "the amount of income or resources" required to maintain the loan. (Malek Tr. 2143:15–2144:9.) Plaintiffs signed the Resource Letters twice—as part of their initial application and at closing—representing that they had the ability to repay their loans.[6] Despite their representations, each of Plaintiffs defaulted on their loans, leading Emigrant to send each Plaintiff multiple written notices that they were at risk of triggering the default 18-percent interest rate and inviting Plaintiffs to

---

[5]     Although not required, Emigrant also had a practice of sending letters to STAR NINA borrowers that identified nonprofit homeownership counseling organizations that provided credit counseling services. (Malek Tr. 2139:5–18, 2142:10–2143:10.) Before closing, the Smalls, Saint-Jeans, Saintils, and Howell received and signed such letters. (*See* Exs. G-15 (credit counseling letter signed by Smalls); R-28 (credit counseling letter signed by Saint-Jeans); Y-67 (credit counseling letter signed by F. Saintil); E-29 (credit counseling letter signed by Howell).)

[6]     (*See* Exs. G-5 (pre-closing resource letter signed by Commodore); L-6 (resource letter signed by Commodore at closing); B-15 (pre-closing resource letter signed by F. Saintil); C-16 (resource letter signed by F. Saintil at closing); F-15 (pre-closing resource letter signed by Smalls); A-17 (resource letter signed by Smalls at closing); K-28 (pre-closing resource letter signed by Saint-Jeans); W-29 (resource letter signed by Saint-Jeans at closing); X-28 (pre-closing resource letter signed by Howell); L-31 (resource letter signed by Howell at closing).)

provide an explanation for the missed payments.[7]  Testimony confirms that Emigrant

mailed multiple notice letters to Plaintiffs that "remind[ed] them if they don't pay

by the end of the month that the default interest rate will start to accrue." (Every Tr.

2361:17–22; *see id.* at 2367:6–2368:6 (authenticating letters mailed to

Commodore).)  The letters asked Plaintiffs to explain "the reason for delinquency

. . . so [Emigrant] can try to see if there's something that [it] can do to work with

them." (*Id.* at 2363:4–6.)  Despite the repeated warnings and opportunity to bring

the loans up to date, each of the Plaintiffs remained in default over 30 days,

triggering the 18-percent interest rate.[8]

In 2010, after falling behind in their payments, Felex and Yanick Saintil

entered into a loan modification agreement with Emigrant, in which the Saintils

agreed to "release and forever discharge Emigrant . . . from any and all claims" other

than those arising from the terms of the modification agreement, in exchange for a

reduced interest rate and a waiver of more than $13,000 in default interest and other

---

[7]     (*See* Exs. J-81 at -58–78 (five default notice letters sent to Saint-Jeans); L-81
at  -50–52 (three default notice letters sent to Saintils); H-81 at -16–17, -19–20, -40–
42, -92 (five default notice letters sent to Commodore); K-81 at -90–92, -03, -16–17
(six default notice letters sent to Smalls); I-81 at -88, -74, 22–23 (three default notice
letters sent to Howell).)

[8]     (*See* Exs. J-81 at -3 (Saint-Jeans defaulted as of September 1, 2008); L-81 at
-4 (Saintils defaulted as of December 1, 2006); K-81 at -12 (Smalls defaulted as of
June 1, 2007); H-81 at -5 (Commodore defaulted as of December 1, 2004); I-81 at
-3 (Howell defaulted as of May 1, 2008).)

-10-

late charges. (Ex. Z-43 at 2–3.) The Association of Community Organizations for Reform Now ("ACORN")—a nonprofit organization that provided advocacy to individuals facing foreclosure—assisted the Saintils in connection with the modification agreement, including by reaching out to Emigrant to discuss the loan, and preparing and submitting the modification application. (F. Saintil Tr. 652:16–654:4.)

### B.    Plaintiffs' Claims

On April 29, 2011, Plaintiffs Jean Robert Saint-Jean and Edith Saint-Jean brought a claim against Emigrant, alleging disparate impact discrimination under the FHA, ECOA, and the NYCHRL on the grounds that Emigrant discriminated against African American and Latino borrowers in mortgage lending transactions. (Dkt. 1.) More than three years later, following the District Court's denial of Emigrant's motion to dismiss (described below), Plaintiffs filed an amended complaint, adding Plaintiffs Felex and Yanick Saintil, Linda Commodore, Beverley and Jeanette Small, and Felipe Howell, and an intentional discrimination claim. (Dkt. 264.) Several of these Plaintiffs admitted that they initiated their claims only after being approached by Plaintiffs' lawyers in 2013. (*See* Howell Tr. 253:13–15; B. Small Tr. 1186:23–1188:2; J. Small Tr. 1348:24–1349:13; Commodore Tr. 1750:1–11.)

### C.  Emigrant's Motion to Dismiss

On June 8, 2011, Emigrant moved to dismiss Plaintiffs' claims on the grounds that, *inter alia*, they were time barred under the applicable statutes of limitations, as they were brought more than three years after Plaintiffs closed on their respective loans.[9] (Dkt. 4 at 11–15.)  In his Report and Recommendation, Magistrate Judge James Orenstein agreed with Emigrant regarding Plaintiffs' discrimination claims under the NYCHRL, but found Plaintiffs' FHA and ECOA claims timely under the discovery rule and doctrine of equitable tolling.  (Dkt. 206 at 20–25.)  The District Court adopted the recommendation with respect to the federal claims, but declined to do so regarding Plaintiffs' claim under the NYCHRL, finding that the doctrine of equitable tolling applied equally to municipal claims.  (Dkt. 258 at 26–33.)  According to the District Court, Plaintiffs' claims were "inherently self-concealing" and were not knowable to Plaintiffs until they met with counsel.  (*Id.* at 30–31.)

---

[9]  Plaintiffs' claims under the FHA and ECOA are subject to a two-year statute of limitations.  *See Fair Housing Justice Ctr., Inc.* v. *Lighthouse Living LLC*, 2021 WL 4267695, at *6 (S.D.N.Y. Sept. 20, 2021); *In re Johnson*, 2014 WL 4197001, at *17 n.5 (E.D.N.Y. Aug. 22, 2014).  Plaintiffs' claims under the NYCHRL are subject to a three-year statute of limitations.  *See Riccardo* v. *NYC Dept. of Educ.*, 2016 WL 7106048, at *6 (S.D.N.Y. Dec. 2, 2016).

### D. Emigrant's Motion for Summary Judgment

On August 3, 2015, Emigrant brought a motion for summary judgment, arguing, among other things, that the District Court should revisit its prior ruling as to the timeliness of Plaintiffs' claims, as discovery had revealed that Plaintiffs were aware of their alleged injuries more than three years prior to filing their claims, and thus were aware of their claims prior to meeting with their counsel. (Dkt. 576-1 at 25–32.) Emigrant had also not taken, nor authorized, any steps to conceal from Plaintiffs the existence of their causes of action. (*Id.* at 24–32.) The discovery rule and doctrine of equitable tolling were thus inapplicable.

Separately, Emigrant argued that the Saintils' claims should be dismissed in light of the Saintils' agreement to "release and forever discharge Emigrant . . . from any and all claims" other than those arising from the Saintils' 2010 agreement with Emigrant to modify the terms of their mortgage. (*Id.* at 38–39; Ex. Z-43.) As the Saintils had knowingly and voluntarily agreed to modify the terms of their mortgage—to their substantial benefit—the agreement was enforceable and their claims were barred. (*Id.*)

The District Court denied Emigrant's motion without explanation. Instead, immediately following oral argument, the District Court simply stated that: "After reading the submissions of both parties, hearing arguments made by both parties, I find that there is a genuine dispute as to material facts or as to material

-13-

facts. Therefore, the defendants' motions for summary judgment is denied." (Feb. 26, 2016 Tr. 54.)

### E.    The 2016 Trial

Trial on the issues of liability and damages took place between May 23, 2016 and June 27, 2016.  Prior to trial, the parties submitted proposed verdict forms for the jury to record its decisions.  Emigrant proposed a special verdict form, so as to require the jury to identify under which of Plaintiffs' two theories of liability (disparate impact or disparate treatment), if any, it found Emigrant liable. (Dkt. 499.)  The District Court denied Emigrant's request, electing instead to use a general verdict form similar to the form proposed by Plaintiffs, which did not provide the jury the opportunity to identify a specific theory of liability.  (Dkts. 501, 518.)

At trial, Plaintiffs' primary theory was that Emigrant used the STAR NINA program to earn significant revenues by advertising and lending disproportionately to minority borrowers with low credit scores who were likely to default.  (Tr. 6:3–11:8, 2976:8–13.)  In advancing this theory, Plaintiffs leaned heavily on the allegedly "predatory" nature of the STAR NINA program, using the inflammatory term "predatory"—over Emigrant's objection—more than 200 times during the trial (*see, e.g.*, Tr. 74:12, 75:20–25, 76:19–22, 324:21–22, 328:13–14, 329:24–25, 1898:1–2, 1957:6–10), including nearly 20 times in their closing

-14-

statement (*id.* 2975:10–3018:12, 3064:10–3072:10). Plaintiffs resorted to this tactic because the undisputed evidence was overwhelmingly against any racial discrimination: the majority of STAR NINA loans were made to white borrowers (Ex. F-7 at 2; Ex. 262; Courchane Tr. 2792:21–2793:4, 2810:5–7), and Plaintiffs' own expert conceded that STAR NINA loans were "not . . . disproportionately bad for minorities" (Ayres Tr. 372:8–10). Indeed, in Plaintiffs' expert's opinion, the STAR NINA loans were "bad for everyone," including white borrowers. (*Id.*) The evidence at trial also did not show that African-American STAR NINA borrowers defaulted or entered foreclosure at statistically higher rates than white borrowers.

Further, Plaintiffs ignored the reality that, despite their allegations of targeted advertising in minority communities, Emigrant's advertising budget was "negligible" (Chiagouris Tr. 2562:20–21), and that none of the Plaintiffs had ever seen an Emigrant advertisement nor had any contact with Emigrant prior to applying for a STAR NINA loan (Howell Tr. 310:23–311:6; B. Small Tr. 1140:12–25; J. Small Tr. 1326:18–1327:2; E. Saint-Jean Tr. 1418:17–25; J. Saint-Jean Tr. 1581:24–1582:9; Commodore Tr. 1719:9–14; Y. Saintil Tr. 1801:23–1802:3). Indeed, the Plaintiffs who were asked whether they had even heard of Emigrant before signing their mortgage testified that they had not. (Howell Tr. 311:1–3; Y. Saintil Tr. 1801:23–1802:3.) The analysis of another of Plaintiffs' experts, Dr. Freeman, also undermined Plaintiffs' racial targeting theory, as it showed that a borrower's credit

score—not the racial composition of their neighborhood—was the more significant factor in whether they received a STAR NINA loan. (*See* Freeman Tr. 1857:8–20; Ex. K-80 at -3 (showing that the incidence ratio of STAR NINA loans was more strongly correlated to credit score (1.57) than zip code (1.32) for African-American borrowers; *see also* Courchane Tr. 2822:22–2823:9).)

After the close of evidence and argument, the District Court charged the jury on Plaintiffs' two legal theories of discrimination:  disparate impact discrimination and disparate treatment (also called "intentional") discrimination.  On disparate impact discrimination, the District Court instructed the jury that:

> First, Plaintiffs must establish by a preponderance of the evidence that [Emigrant's] practice of making STAR NINA loans actually or predictably had a substantial adverse impact on African-American or Hispanic borrowers.

> Second, if you find Plaintiffs have proven the first factor, then you must decide whether [Emigrant] ha[s] established by a preponderance of the evidence that the practice of making STAR NINA loans was necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of [Emigrant].  If you find that [Emigrant] failed to establish that the practice was actually necessary to achieve their substantial, legitimate, and nondiscriminatory interests, you must find for Plaintiffs on their discriminatory effect claim.

> Third, if you find that the STAR NINA loan program was necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of [Emigrant], then you must decide whether Plaintiffs have established by a preponderance of the evidence that [Emigrant's] interests could have been served by another practice that had a less discriminatory effect.  If Plaintiffs make this showing, then you must find for Plaintiffs on their discriminatory effect claim.

(Dkt. 522 at 35–36.)

Over the objection of Emigrant's counsel, the District Court did not include in the charge an instruction that any adverse impact on African Americans be disproportionate "as compared" to non-African-American borrowers. (Tr. 2743:1–2744:24.) In this respect, the District Court's instruction even departed from Plaintiffs' proposed instructions, which stated that Plaintiffs needed to show that Emigrant's "practice of making STAR NINA loans actually or predictably resulted in an adverse impact that had a *disproportionate effect on African Americans* and Hispanics." (Dkt. 486 at 4 (emphasis added).) In other words, the District Court's instruction left out what both parties understood to be the crucial element of the instruction. Emigrant further objected that "the charge d[id] not incorporate . . . the concept of causation" as required by the Supreme Court's decision in *Inclusive Communities*, nor Plaintiffs' burden "to show . . . that there was some other practice that was available to [Emigrant] that would have achieved . . . the same objective." (Tr. 2748:17–2749:6.) Finally, Emigrant also objected to the District Court's instructions to the extent they did not include Emigrant's proposed language requiring Plaintiffs to identify a specific "race-neutral practice or policy" that caused the allegedly "significantly adverse or disproportionate impact" on African-American borrowers. (Dkt. 484 at 8; Tr. 3062:12–22 (Emigrant objecting to the

-17-

"proposed charges to the extent that they [were] inconsistent with or d[id] not incorporate [Emigrant's] propose[d] [] charges").)

On intentional discrimination, the District Court instructed the jury that:

Plaintiffs must establish that: (1) the STAR NINA loan product was grossly unfavorable to the borrower; and (2) [Emigrants'] effort to make STAR NINA loans in certain communities was motivated, at least in part, by race, color, or national origin. . . . Plaintiffs are not required to show that [Emigrant] acted with racial animus, which means hatred or dislike for a particular racial or ethnic group. Nor do they need to prove that race, color, or national origin was the only reason for [Emigrant's] conduct. Rather, they are only required to show that race, color, or national origin was one motivating factor. This means that in order for [Emigrant] to be found liable . . . race, color, or national origin need only have played some role in Defendants' conduct.

The fact that [Emigrant] offer[s] explanations for their actions does not mean that they are not liable for intentional discrimination. If you conclude that the explanations are false or unworthy of credence, you may infer that [Emigrant's] actions were motivated by discrimination on the basis of race, color, or national origin.

If you find by a preponderance of the evidence that [Emigrant's] explanations for their actions are not the true reason for their actions, you may infer that [Emigrant's] actions were motivated by race, color, or national origin, and therefore violated the [FHA], [ECOA], and [NYCHRL].

(Dkt. 522 at 33–34.)

Emigrant's counsel objected to the District Court's instruction that "Plaintiffs are not required to show that [Emigrant] acted with racial animus" on the basis that this Court has articulated that intentional discrimination "includ[es] animus, i.e. racial animus," and that "racial animus" must have been "a significant

factor in [Emigrant's] decision." (Tr. 2736:14–25, 2740:5–11.) Emigrant also objected to the District Court's use of the phrase "motivated, at least in part, by race, color, or national origin" as misrepresenting the standard articulated by the U.S. Supreme Court in *Village of Arlington Heights* v. *Met. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977), which instead required the jury to consider "whether invidious discriminatory purpose was a motivating factor." (Dkt. 511.) Emigrant's counsel explained that Plaintiffs were required "to show that Emigrant targeted the plaintiffs based on their race," that it "act[ed] with intent." (Tr. 2768:1–7.)

After deliberations, the jury found Emigrant liable as to all Plaintiffs, except the Saintils, who it found had "knowingly and voluntarily agreed to release their claims against Emigrant." (Dkt. 518 at 2.) In light of the District Court's decision to provide the jury with a general verdict form, however, there was no indication on which basis—disparate impact or intentional discrimination—the jury had found Emigrant liable. The jury awarded total compensatory damages of $950,000. The jury refused to award punitive damages. (*Id.*)

## F.  Emigrant's Motion for Judgment as a Matter of Law or a New Trial

Following the verdict, Emigrant moved under Fed. R. Civ. P. 50 and 59 for judgment as a matter of law or, in the alternative, a new trial, for several reasons. (Dkt. 585.)

-19-

*First*, Emigrant argued that Plaintiffs' claims were time-barred, as neither the discovery rule nor the doctrine of equitable tolling applied. Plaintiffs had been shown multiple times the challenged terms in their mortgage agreements, including the 30-day default interest provision, the 18-percent default interest rate, and the various fees associated with the loans, and thus, under black letter law, had discovered their causes of action well over three years before filing suit. (Dkt. 585-1 at 17–18.) The District Court dismissed this argument largely for the reasons articulated in the District Court's decision on Emigrant's motion to dismiss; namely, that "discriminatory mortgage lending is inherently self-concealing" and thus Plaintiffs were unaware of their causes of action until meeting with counsel. (Dkt. 618 at 26–27.)

*Second*, Emigrant argued that the District Court improperly instructed the jury as to the required elements of disparate impact by failing to explain that, in order to meet their burden, Plaintiffs were required to (1) show that any adverse impact on African-American borrowers was disproportionate as compared to other borrowers; (2) show that Emigrant's practice caused the purported disparity; and (3) identify an available alternative practice to serve Emigrant's nondiscriminatory interests. (Dkt. 585-1 at 6–8.) The District Court dismissed these arguments on the grounds that "Plaintiffs offered evidence at trial that STAR NINA loans had a substantial adverse impact on African-American or Hispanic borrowers" (Dkt. 618

-20-

at 20–23), again ignoring that the impact needed to have been disparate, not just adverse.  The District Court provided no response to Emigrant's argument regarding the absence of available alternatives and noted only that "Emigrant's additional objections to the jury instructions have been considered by this Court and are without merit." (*Id.* at 24.)

*Third*, Emigrant argued that the District Court improperly instructed the jury as to intentional discrimination by failing to explain that Plaintiffs were required to show that Emigrant had acted with racial animus and intent.  (Dkt. 585-1 at 4.)  The District Court rejected this argument, holding that the "word 'animus' need not appear in a charge on intentional discrimination" as it was sufficient to instruct that "race" needed to be "one significant factor" in the process (Dkt. 618 at 16–19), even though the phrase "significant factor" was not used in the charge (which instead required only that race be "one motivating factor").

Plaintiffs also brought a motion seeking a new trial for the Saintils on the basis that their 2010 loan modification agreement was unenforceable.  (Dkt. 589.)  On grounds not raised by Plaintiffs, the District Court granted Plaintiffs' motion, finding the Saintils' "release to be void against public policy."  (Dkt. 618 at 31.)  The District Court held that, because African American and Latino communities had historically been offered "loans most likely to result in equity-stripping," and "[t]he [Saintils' loan] modification [] did little to bring the Saintils

within reach of making regular payments for any considerable length of time" on their mortgage, the District Court had "concerns about Emigrant's motivations." (*Id.* at 29–30.) The District Court thus ordered a new damages trial for the Saintils. (*Id.* at 31.)

The District Court then took the extraordinary step of ordering *sua sponte* a new trial on damages for *all* Plaintiffs on the grounds that, in the Court's view, the awards were too low, "against the weight of the evidence," and "the source of the damages assessed [was] not clear." (Dkt. 618 at 35, 41.)[10]

### G. The 2019 Trial and Subsequent Proceedings

Pursuant to the District Court's *sua sponte* order, a second damages trial took place between May 7, 2019 and May 23, 2019, following which the jury awarded total compensatory damages of $722,048 and no punitive damages—a figure approximately $225,000 less than the first jury awarded. (Dkt. 732.)

---

[10] As part of an unfortunate pattern of giving Plaintiffs more than they asked for, the District Court ordered a new trial on damages despite Plaintiffs' position (in arguing against Emigrant's motion for judgment as a matter of law (ECF No. 585)) that the damages awarded were "[r]easonable" and "fully supported by the trial record" (ECF No. 586 at 23).

## STANDARD OF REVIEW

1. The District Court's application of the discovery rule and the doctrine of equitable tolling to the statute of limitations arguments is reviewed *de novo*. *See Riley* v. *Brook*, 667 Fed. App'x 12, 13 (2d Cir. 2016) (Second Circuit "review[s] *de novo* a district court's grant of a motion to dismiss, including its legal interpretation and application of a statute of limitations"); *see also Patel* v. *Searles*, 305 F.3d 130, 134 (2d Cir. 2002) ("We review the district court's denial of defendant's motion to dismiss on the pleadings *de novo*"). Likewise, the denial of a motion for judgment as a matter of law on this issue is reviewed *de novo*. *Warren* v. *Pataki*, 823 F.3d 125, 137 (2d Cir. 2016).

2. and 3. The District Court's jury charge is reviewed *de novo*. *See Boyce* v. *Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) ("When a party challenges a court's jury charge, [the Second Circuit] reviews the instructions *de novo* and as a whole.").

4. The District Court's ruling that the Saintils' release agreement is unenforceable is reviewed *de novo*. *See U.S.* v. *Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 87 (2d Cir. 2011) (The Second Circuit "[r]eview[s] *de novo* [] legal issues as to . . . contract enforceability").

## SUMMARY OF ARGUMENT

The District Court committed a series of errors, each of which independently entitles Emigrant to either judgment as a matter of law or a new trial.

*First*, the District Court improperly applied the discovery rule and doctrine of equitable tolling to hold that Plaintiffs' claims are not barred by the statute of limitations. As the record makes clear, and under black letter law, Plaintiffs' claims are time-barred because Plaintiffs were familiar with the terms of their loans at the time of closing and were thus aware of their injuries more than three years prior to bringing their claims. Under that law, whether Plaintiffs knew about the purported discrimination is irrelevant. Moreover, Plaintiffs never identified a single action that Emigrant took to conceal Plaintiffs' claims from them, and thus equitable tolling does not apply. At bottom, under the District Court's logic, Plaintiffs could take out a 30-year mortgage under facially "predatory" loan terms, but wait decades to sue on a discrimination claim as long as a lawyer had not explained to Plaintiffs the details of that claim.

*Second*, after declining to provide the jury with a special verdict form—thereby preventing it from identifying the basis on which it found Emigrant liable—the District Court erred in its instructions to the jury on both Plaintiffs' disparate impact and intentional discrimination theories of liability. On disparate impact, the District Court failed to instruct the jury that disparate impact discrimination requires

-24-

proof that African-American borrowers, such as Plaintiffs, suffered a *disproportionately* adverse effect from the STAR NINA loan program, as compared to non-African-American borrowers. The omission is particularly glaring as, despite adopting nearly verbatim Plaintiffs' proposed instructions, the District Court elected to *strike* Plaintiffs' proposed language requiring STAR NINA loans to have "had a disproportionate effect on African Americans." (*See* Dkts. 486 at 4; 522 at 35.) The District Court's instruction thus materially altered the standard under which the jury could find liability and steered the jury away from the undisputed evidence that not only were STAR NINA loans made disproportionately to white borrowers (Ex. F-7 at 2; Ex. 262; Courchane Tr. 2792:21–2793:4, 2810:5–7), but that they were "not . . . disproportionately bad for minorities." (Ayres Tr. 372:5–10.) The District Court's instructions also failed to properly articulate Plaintiffs' obligation to identify an available alternative practice, or explain the burden-shifting or "robust causality" requirements of a disparate impact discrimination claim.

The District Court's charge on intentional discrimination was similarly flawed, as it instructed that Plaintiffs were "*not* required to show that [Emigrant] acted with racial animus," but rather only to show that race was a "motivating factor." (Dkt. 522 at 33 (emphasis added).) This instruction directly contradicts this Court's precedent, which requires Plaintiffs to prove that "*animus* against the

protected group was a *significant factor*" in the impugned decision-making process. *Mhany*, 819 F.3d at 606 (emphasis added).

These were not "harmless" errors, as they improperly permitted the jury to find liability where none existed. Each error thus independently warrants a new trial.

*Third*, and finally, the District Court erred in improperly overturning the jury's finding that the Saintils knowingly and voluntarily released their claims against Emigrant as part of their 2010 loan modification agreement. Contrary to the District Court's holding, no "public policy" was violated by the Saintils' agreement. If anything, the agreement helped further the public interest by promoting society's "strong public policy favoring settlements." *See Anita Founds., Inc.* v. *ILGWU Nat. Ret. Fund*, 902 F.2d 185, 190 (2d Cir. 1990).

## ARGUMENT

## I.     THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS-APPELLEES' CLAIMS WERE TIMELY.

The District Court erred when it applied the discovery rule and the doctrine of equitable tolling to hold that Plaintiffs' discrimination claims were timely. (Dkt. 258 at 25.) Plaintiffs' federal claims under the FHA and ECOA are subject to a two-year statute of limitations, and their claims under the NYCHRL are subject to a three-year statute of limitations. *See supra* at 12 n.9. Claims arising under these statutes accrue on the dates that the alleged violations occurred, which is when the Plaintiffs closed on the allegedly discriminatory loans. *See Grimes* v. *Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 290 (S.D.N.Y. 2011) (housing discrimination claims time-barred when "based on conduct that . . . undoubtedly concluded with the close of the transaction"); *Pantoja* v. *Scott*, 2001 WL 1313358, at *10 (S.D.N.Y. Oct. 26, 2001) (in FHA claim, "alleged discriminatory act concluded with the closing on the apartment"); *Humphrey* v. *Citibank NA*, 2013 WL 5407195, at *5 (N.D. Miss. Sept. 25, 2013) ("[An] FHA claim such as that presented by Plaintiff 'hones in on the origination and consummation of her loan.'") (quoting *Davenport* v. *Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 875 (N.D. Cal. 2010)). It is undisputed that all of the Plaintiffs closed on their loans more than three years before the Saint-Jeans filed their complaint on April 29, 2011, and more than six

-27-

years before the other Plaintiffs joined in this litigation on October 2, 2014.[11] Plaintiffs' claims are thus time-barred, and cannot be saved by the discovery rule or the doctrine of equitable tolling.

### A. The District Court Erred in Finding that the Discovery Rule Rendered Plaintiffs' Claims Timely.

Claims subject to the discovery rule are deemed to accrue when the plaintiff "knows or has reason to know of the injury that serves as the basis for the action."[12] *Clement* v. *United Homes, LLC*, 914 F. Supp. 2d 362, 371–72 (E.D.N.Y. 2012) (internal quotation marks omitted). Under this rule, "it is not necessary for a plaintiff to understand every permutation of his or her injury, rather the plaintiff simply needs to have a 'hint' or 'suspicion' of the injury and its cause to be put on inquiry notice." *Thompson* v. *Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 48 (S.D.N.Y. 2001).

The District Court erred in finding that the discovery rule saved Plaintiffs' claims on the grounds that their injuries were not apparent until "Plaintiffs

---

[11]  (E. Saint-Jean Tr. 1367:23–24, Ex. R-29 (Saint-Jeans closed on January 10, 2008); F. Saintil Tr. 641:19–22, Ex. Z-15 (Saintils closed on August 2, 2006); B. Small Tr. 1081:25–1082:2, Ex. K-17 (Smalls closed on August 11, 2006); Howell Tr. 236:10–12, Ex. M-31 (Howell closed on February 6, 2008); Commodore Tr. 1696:1–3, Ex. M-6 (Commodore closed on August 27, 2004).)

[12]  The discovery rule does not apply to claims arising under the NYCHRL. *See Hales* v. *HSBC Bank U.S.A., N.A.*, 347 F. App'x 698, 699 (2d Cir. 2009); *Guilbert* v. *Gardner*, 480 F.3d 140, 149 (2d Cir. 2007); (Dkt. 206 at 24).

-28-

met with counsel and understood they were victims of a discriminatory lending scheme." (Dkt. 258 at 29.)  As an initial matter, the District Court improperly relied on the U.S. Supreme Court's decision in *Merck & Co.* v. *Reynolds*, 559 U.S. 633, 644 (2010), and this Court's decision in *City of Pontiac Gen. Employees' Ret. Sys.* v. *MBIA, Inc.*, 637 F.3d 169, 174–75 (2d Cir. 2011), to hold that, "for purposes of the discovery rule . . . a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."  (Dkt. 258 at 26–27.)  The *Merck* and *MBIA* decisions are limited to securities fraud cases arising under 28 U.S.C. § 1658(b) and are inapplicable here. *See Koch* v. *Christie's Int'l PLC*, 699 F.3d 141, 149 (2d Cir. 2012) ("Because it was a securities fraud action, 28 U.S.C. § 1658(b) governed the accrual rule in *Merck*.").

Outside of the securities fraud context, it is the "discovery of the *injury*, not discovery of the other elements of a claim, [that] starts the clock."  *Rotella* v. *Wood*, 528 U.S. 549, 555 (2000) (emphasis added).  When analyzing similar housing discrimination claims, courts have held that a plaintiff "need not know each and every relevant fact of his injury or *even that the injury implicates a cognizable legal claim*," but rather need only have "knowledge of, or knowledge that could lead to, the basic facts of [their] injury."  *Clement*, 914 F. Supp. 2d at 372 (emphasis added) (quoting *Corcoran* v. *N.Y. Power Auth.*, 202 F.3d 530, 544 (2d Cir. 1999)).  As Judge Mauskopf explained, "[t]his reasoning has been applied to the context of

-29-

employment discrimination, where a plaintiff's claim begins to run when he learns of the discriminatory conduct, e.g. the unlawful termination, not when the plaintiff has reason to know of a possibly discriminatory motive for that conduct." *Id.* (citing *Morris* v. *Broadridge Fin. Servs., Inc.*, 2010 WL 5187669, at *3 (E.D.N.Y. Dec. 14, 2010) (collecting cases)).

Evidence presented to the District Court indisputably showed that Plaintiffs had "knowledge of, or knowledge that could lead to, the basic facts of [their] injury" when they closed on their loans and signed documents setting forth the exact terms about which they now complain, *i.e.*, the 30-day default interest provision and 18-percent default interest rate.[13] Even if those documents had not put them on notice, all of Plaintiffs' claims—with the sole exception of the Saint-Jeans' NYCHRL claims—would still be untimely because they were brought more than two or three years, respectively, after Emigrant imposed a higher default interest rate following Plaintiffs' extended default on their loans.[14] It is this default interest

---

[13]     (*See* Exs. J-29, K-29, L-29, O-29, Q-29, R-29, U-29, W-29 (loan documents signed by Saint-Jeans); W-15, X-15, Z-15, B-16, C-16, F-16, P-16 (loan documents signed by Saintils); F-15, N-15, T-16, W16, X-16, A-17, B-17, E-17, K-17, P-17, R-17, X-17 (loan documents signed by Smalls); X-28, L-31, M-31 (loan documents signed by Howell); G-5, A-6, B-6, D-6, H-6, L-6, M-6 (loan documents signed by Commodore).)

[14]     (*See* Exs. J-81 at -59 (Saint-Jeans began accruing default interest on September 1, 2008, but did not bring claims until April 29, 2011); L-81 at -52 (Saintils began accruing default interest on December 1, 2006, but did not bring

-30-

rate that forms the core of Plaintiffs' case; throughout their complaint, they refer to it as "exorbitant," "abusive and patently unaffordable," and "onerous." (Dkt. 264 ¶¶ 1, 5–9, 37.) After Plaintiffs went into default on their loans, Emigrant sent written notices informing each of them that "[their] mortgage contains a provision which provides for default interest to accrue at 18.000% . . . if payment is not made by the end of th[e] month."[15] At the very least, the imposition of this default rate, and the notices preceding it, provided Plaintiffs with knowledge of the basic facts of their injury. *See Clement*, 914 F. Supp. 2d at 372 (dismissing fraud claims as untimely where "[e]ven if [plaintiff] did not know if its legal significance at the time [of sale], [she] learned of her injury 'within months' of moving into her new home, when the 'warranty problems came to her attention.'").[16]

   Because Plaintiffs were put on notice of their injury at the time of closing, or, at the latest, by the time they were subject to higher default interest rates, the discovery rule cannot save their untimely claims. To find otherwise, under the

---

claims until October 2, 2014); H-81 at -19 (Commodore began accruing default interest on December 1, 2004, but did not bring claims until October 2, 2014); K-81 at -16 (Smalls began accruing default interest on June 1, 2007, but did not bring claims until October 2, 2014); I-81 at 74 (Howell began accruing default interest on May 2, 2008, but did not bring claims until October 2, 2014).)

[15] (Exs. J-81 at -58; L-81 at -50; H-81 at -16–17; K-81 at 90–92; I-81 at -88.)

[16] The continuing violation doctrine also does not save Plaintiffs' claims, because there was no evidence of any discriminatory acts within the respective limitations periods. (Dkt. 395 at 32–33.)

District Court's logic, would extend the limitations period indefinitely, as Plaintiffs could simply sit on their hands over the course of their 30-year mortgages, and then raise discrimination challenges decades after closing as long as a lawyer had not yet explained to them the elements of their claim. That is not how the discovery rule works.

### B. The District Court Erred in Finding that Plaintiffs' Claims Were Salvaged by Equitable Tolling.

Equitable tolling is available in "rare and exceptional circumstances" where the court finds that "'extraordinary circumstances' prevented a party from timely performing a required act, and that the party 'acted with reasonable diligence throughout the period he sought to toll.'" *Walker* v. *Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe* v. *Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)). For this reason, equitable tolling is appropriate only where "it would have been *impossible* for a reasonably prudent person to learn about his or her cause of action." *Pearl* v. *City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (internal quotation marks omitted). To invoke equitable tolling on the federal discrimination claims, Plaintiffs needed to demonstrate "(1) that [Emigrant] concealed from [them] the existence of [their] cause of action, (2) that [they] remained in ignorance of that cause of action until some point within . . . the commencement of [the limitations period], and (3) that [their] continuing ignorance was not attributable to lack of diligence on [their] part." *New York* v. *Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.

1988). Plaintiffs here failed to meet their burden to establish either that Emigrant "concealed from [them] the existence of [their] cause of action" and that they exhibited diligence to investigate it. Their claims are thus not eligible for equitable tolling.

*First*, the District Court erred by finding Plaintiffs' claims timely despite Plaintiffs' failure to provide *any* evidence that Emigrant concealed their causes of action from them. The concealment element requires Plaintiffs to establish that Emigrant "took affirmative steps to prevent [Plaintiffs'] discovery of [their] claim or injury." *Id.* At the pleading stage, the District Court found that Plaintiffs satisfied the concealment prong based on "overt and intentional acts" alleged by Plaintiffs in their complaint. (Dkt. 258 at 31.) In particular, the District Court relied on Plaintiffs' allegations that Emigrant "steer[ed] Plaintiffs to mortgage brokers who directed them towards more costly loans" and made "explicit and repeated representations . . . that were untrue or unavailing." (*Id.* at 31–32.) At summary judgment and trial, however, Emigrant offered conclusive evidence establishing that the brokers used by Plaintiffs were neither employees nor agents of Emigrant, but rather were acting on behalf of the borrowers.[17] Plaintiffs were well aware that their

---

[17] The evidence established that Emigrant was not involved in Plaintiffs' selection of brokers, who were introduced to Plaintiffs by friends, family, or people with whom they did business. The Saint-Jeans were referred to their broker by their daughter. (E. Saint-Jean Tr. 1366:20–1367-24, 1407:2–1408:25, 1413:7–1416:15;

brokers were not working on behalf of Emigrant and could freely submit loan applications to different lenders, which belies any claim that the brokers had apparent authority to act on Emigrant's behalf.[18]  Plaintiffs also failed to offer any evidence that Emigrant representatives concealed material terms of the loans through untrue representations.   The District Court declined to analyze—or even acknowledge—any of the evidence concerning Plaintiffs' choice of their own brokers.  Instead, the District Court simply affirmed its prior ruling at the pleading stage, stating that "there [was] a genuine dispute as to material facts." (Feb. 26, 2016 Tr. 54.)

Beyond their unsupported allegations regarding their brokers, Plaintiffs failed to provide any evidence that Emigrant engaged in affirmative concealment. Although Plaintiffs claimed that Emigrant did not explain the loan terms during

---

J. Saint-Jean Tr. 1524:24–1525:16; Ex. C-27.)  The Saintils were referred to their broker by a Citibank employee who told the Saintils they would not qualify for a Citibank loan.  (F. Saintil Tr. 691:11–695:7.)  The Smalls were referred to their broker by the real estate agent involved in their purchase of property years earlier. (B. Small Tr. 1073:3–15, 1076:7–18, 1105:7–1106:9.)  Commodore contacted her broker when seeking to obtain a refinance loan at the suggestion of a friend. (Commodore Tr. 1716:2–1719:11.)   Howell was referred to his broker by a contractor who approached him about construction on his home.   (Howell Tr. 233:11–18.)

[18]    (J. Saint-Jean Tr. 1528:4–1529; Ex. C-27; F. Saintil Tr. 691:20–693:13; B. Small Tr. 1105:7–1106:9; Howell Tr. 295:11–297:15; Commodore Tr. 1717:2–1718:13; Ex. E-5.)

-34-

closing and that they did not understand them (Dkt. 364 at 5), that allegation, even if it were true (which it is not), is insufficient to support equitable tolling. *See Clark* v. *Chase Bank USA, N.A.*, 643 Fed. App'x 838, 841 (11th Cir. 2016) ("That Plaintiff failed to understand fully the consequences of the loan terms, or failed to pay attention to them, does not entitle her to equitable tolling, particularly where Plaintiff has alleged no facts that she acted diligently."). In fact, contrary to these allegations, Emigrant produced evidence that, at their respective closings, Plaintiffs received and signed documents spelling out in detail all of the challenged terms and purportedly discriminatory features about which they now complain.[19] For example, Plaintiffs alleged that Emigrant harmed Plaintiffs by "extracting exorbitant 'default' interest charges—calculated at a predatory 18% interest rate—from the borrowers' equity." (Dkt. 264 ¶ 1.) But Plaintiffs all received and signed documents explaining that if they went into "extended default," the default interest rate on their loans "w[ould] be increased to 18% per annum."[20] Plaintiffs also complained that Emigrant offered these no-income loans to individuals with credit scores below 600 (*id.* ¶ 31), but the

---

[19]    (*See* Howell Tr. 275:15–277:20, 282:12–283:8; B. Small Tr. 1138:17–1139:17, 1142:9–1152:22; J. Small Tr. 1323:12–1326:17, 1331:2–1334:4; E. Saint-Jean Tr. 1428:4–1434:23; J. Saint-Jean Tr. 1545:20–1548:13; Commodore Tr. 1723:2–1727:25; Pl. Exs. 131, 213A, 607, 608; Exs. G-5, A-6, B-6, H-6, L-6, E-15, N-15, T-16, X-16, A-17, E-17, K-17, X-17, K-28, X-28, D-29, L-29, R-29, U-29, W-29, G-70.)

[20]    (Exs. H-6, N-15, P-16, X-17, U-29, M-31.)

key features of Emigrant's STAR NINA program—including the availability of "sub-prime credit loans" and "no income/no asset products"—were publicly available for years and evident to Plaintiffs when they qualified for the loans.[21]  In addition, Emigrant required that Plaintiffs sign a "resource letter" both before and at closing that identified the annual income that would be required to adequately service the loan.[22]  The "Resource Letter" is not a disclosure required by any law or regulation.  It is a form that Emigrant required its borrowers to sign to ensure that its borrowers fully understood the terms of the loan, which stands in stark contrast to Plaintiffs' allegations of concealment.  Finally, Emigrant sent repeated notices to Plaintiffs, explicitly reminding them of the operation of the 18-percent default rate.[23]  Having signed documents that identify all the material terms that form the basis of their claims, and having been repeatedly reminded of the operation of the default interest rate, Plaintiffs could not possibly have established that Emigrant concealed any cause of action from them.

---

[21]     (Dkt. 576-6, Ex. 45 at 28 (Community Reinvestment Act Performance Evaluation for Emigrant Savings Bank, dated November 1, 1999).)

[22]     (*See* Exs. G-5, L-6, B-15, C-16, F-15, A-17, K-28, W-29, X-28, L-31.)

[23]     (*See supra* at 10 n.7; *see also* Ex. R-15 (timeline of expected borrower communications for STAR NINA loans).)

On a separate basis, the District Court held that equitable tolling applied because Plaintiffs' claims are "inherently self-concealing" (Dkt. 258 at 30),[24] and thus Plaintiffs had "little or no basis to understand their claims and the nature of a systematic, discriminatory equity-stripping scheme" before "speaking to counsel representing them in this action" (*id.* at 31–32). But there is nothing inherently "self-concealing" about Plaintiffs' claims, which challenge the STAR NINA program's offering of "18% 'default' interest rates and other onerous terms" to African Americans (Dkt. 264 ¶ 234)—terms that were all disclosed to Plaintiffs at the time of closing. Moreover, the District Court's holding effectively eliminates the statute of limitations altogether by allowing Plaintiffs' claims to toll without end until a lawyer explains the precise "discriminatory equity-stripping" that forms the basis of their complaint. Although this Court has recognized certain types of claims to be inherently self-concealing, such as a bid-rigging conspiracy, "[i]n order to endure, [such claims] must remain concealed." *Hendrickson Bros., Inc.*, 840 F.2d at 1084. Plaintiffs' claim that Emigrant engaged in discrimination by offering purportedly bad loan terms does not fall within that category.

---

[24] The District Court repeated this assertion in denying Emigrant's post-trial motion for judgment as a matter of law, where it again held that "discriminatory mortgage lending is inherently self-concealing." (Dkt. 618 at 27.)

To support its conclusion that "discriminatory mortgage lending" claims are "inherently self-concealing," the District Court relied on a series of district court opinions that are not analogous and do not establish any such blanket rule. (Dkts. 258 at 29–33; 618 at 26–27.) In *M & T Mortgage Corp.* v. *White*, for example, the court made the case-specific finding that "the nature of the scheme alleged by the plaintiffs [was] inherently self-concealing" where the defendants took affirmative steps to conceal "a systematically fraudulent and discriminatory scheme," including by referring the plaintiffs to "two frequently used attorneys" who did not represent their interests and using inflated appraisals of the plaintiffs' property. 735 F. Supp. 2d 538, 556–57, 560 (E.D.N.Y. 2010).

Likewise, in *Council* v. *Better Homes Depot, Inc.*, the district court found that equitable tolling was appropriate where plaintiffs alleged that an attorney working for the defendants "falsely stated that he represented Plaintiffs" to induce them to sign closing documents. 2006 WL 2376381, at *1, *9 (E.D.N.Y. Aug. 16, 2006). In *Phillips* v. *Better Homes Depot, Inc.*, the court applied equitable tolling where the defendants "rebuffed" the plaintiffs' attempts to uncover information about their mortgages. 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003). At best, these cases suggest that housing discrimination claims may be "self-concealing" where defendants take affirmative steps to prevent plaintiffs from understanding the terms of their loans. Plaintiffs offered no evidence that Emigrant

-38-

engaged in any sort of comparable scheme that would prohibit them from investigating their claims.

This case is more akin to *Grimes*, where the plaintiffs brought intentional and disparate impact claims alleging that the defendants "targeted African-Americans for higher cost subprime mortgage loans." 785 F. Supp. 2d at 290. There, the court held that because the complaint "does not allege that any purported acts of discrimination occurred after . . . the transaction closed," the limitations period began to run on the closing date. *Id.* The court found that equitable tolling did not apply because the plaintiffs had not alleged with particularity that the defendants "concealed [their] FHA claim from them during the applicable statute of limitations." *Id.* at 291. Similarly, in *Jordan* v. *Chase Manhattan Bank*, the court found that equitable tolling did not apply to the plaintiff's housing discrimination claims where the complaint alleged only general accusations of "bad faith," "intentional misrepresentation," and "deception," but did not "allege any specific ways in which actions by defendants misled [the plaintiff] to make her unaware that she had suffered an injury for which she could seek a remedy at law." 2014 WL 3767010, at *9 (S.D.N.Y. July 31, 2014). Here too, Plaintiffs offered no

evidence that Emigrant actively concealed the basis for their claims following the closing date of their loans, and thus equitable tolling could not apply.[25]

*Second*, Plaintiffs cannot satisfy the third requirement for equitable tolling because their failure to seek legal assistance for their claims in a timely manner resulted from their own lack of due diligence. Plaintiffs received written documentation of the full set of loan terms that form the basis of their complaint years before filing this suit, including documents that they signed that explained the 18-percent default interest rate and the minimum income required to service the loan. At the summary judgment stage, Plaintiffs made no showing to establish that they acted with any degree of reasonable diligence to inquire about their claims. The District Court did not engage in any assessment of Plaintiffs' diligence, but instead simply accepted that the statute of limitations should not begin to run until Plaintiffs first met with their lawyers. This Court has warned that equitable tolling, "if applied

---

[25] Equitable tolling cannot apply to the Saint-Jeans' FHA and ECOA claims for the additional reason that that they unquestionably became aware of their claims when they attended court proceedings in August 2008 and March 2009 (E. Saint-Jean Tr. 257:3–258:1; J. Saint-Jean Tr. 13:15–27:22; *see* 2016 Trial Tr. 1497–98, 1586), but did not file this action until more than two years later, in April 2011. Both of the Saint-Jeans testified that they believed Emigrant charged higher rates to African American borrowers based on their time observing court proceedings relating to Emigrant. (E. Saint-Jean Tr. 257:3–258:1; J. Saint-Jean Tr. 13:15–27:22.) Thus, even if the Saint-Jeans were not already on notice of their claims based on Emigrant's disclosures at closing, they were put on notice over two years prior to filing when they attended these proceedings.

too liberally[, . . .] threatens to undermine the purpose of statutes of limitations of allowing potential defendants predictability and ultimate repose." *Veltri* v. *Building Service 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004). The District Court's position that a statutory limitations period may be tolled indefinitely as long as the plaintiff has not yet spoken to a lawyer flies in the face of this Court's guidance that tolling is appropriate only where it "would have been *impossible*" to learn of a cause of action. *Pearl*, 296 F.3d at 85. Especially here, where, according to Plaintiffs, they each closed on a mortgage loan containing allegedly "predatory," "exorbitant," and "sky-high interest rates," as well as other "pernicious terms" (Dkt. 264 ¶¶ 1, 33), and yet declined to exercise any reasonable diligence to investigate potential claims until well after the limitations period had run.

On this record, the District Court's finding that Plaintiffs' claims were equitably tolled represents clear and prejudicial error.

## II. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ITS JURY INSTRUCTIONS.

The District Court erred in its instruction to the jury on both theories of liability advanced by Plaintiffs, improperly relieving Plaintiffs of their legal burden in proving disparate impact and intentional discrimination. *See Anderson* v. *Branen*, 17 F.3d 552, 556 (2d Cir. 1994) ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."). Because—over Emigrant's objection—the District Court authorized the use

of a general verdict form on liability, it is impossible to discern the basis for the jury's liability verdict, and thus impossible to conclude that an error on either instruction did not taint the jury's findings. *See Morse* v. *Fusto*, 804 F.3d 538, 551 (2d Cir. 2015) (en banc) ("general verdict rule" requires a new trial "where there is no way to know that an invalid claim . . . was not the sole basis for [a] verdict" (internal quotation marks omitted)). Whether considered independently or collectively, these errors were thus not "harmless," and a new trial is warranted. *Aponte* v. *Kanbur*, 2021 WL 3854069, at *4 (2d Cir. Aug. 30, 2021) ("In general, we review challenges to jury instructions in civil cases *de novo*, and will grant a new trial if we find an error that is not harmless.") (quoting *Rasanen* v. *Doe*, 723 F.3d 325, 331–32 (2d Cir. 2013)).

### A. The District Court Erred in Its Jury Instruction on Disparate Impact Discrimination.

To prevail on their disparate impact claim, Plaintiffs were required to identify "[1] practices that have a 'disproportionately adverse effect on minorities' and [2] are otherwise unjustified by a legitimate rationale." *Inclusive Communities*, 576 U.S. at 524 (quoting *Ricci* v. *DeStefano*, 557 U.S. 557, 577 (2009)). In other words, Plaintiffs needed to show that a specific STAR NINA practice disproportionately impacted African-American borrowers relative to non-African-American borrowers. Over Emigrant's objections, the District Court's disparate

impact instruction failed to require the jury to find *any* of these required elements, thereby improperly easing Plaintiffs' burden.

*First*, the District Court failed to instruct the jury that Plaintiffs must prove that the alleged discriminatory policy or practice had a *disproportionately adverse* effect on members of a protected class *as compared to its effect on others who were not members of the protected class.*  It is axiomatic that "a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis* v. *W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003), *superseded by regulation on other grounds*. It is for this reason that the U.S. Supreme Court has instructed that disparate impact liability requires proof of practices that have a "*disproportionally* adverse effect on minorities." *Inclusive Communities*, 576 U.S. at 524 (emphasis added).  Here, however, the District Court instructed the jury that Plaintiffs only needed to establish "a substantial adverse impact on African American[] or Hispanic[] borrowers,"[26] and offered no instruction to compare that impact with the impact on non-African

---

[26]     The word "substantial" means "considerable in quantity" or "considerable in extent[] [or] amount."  The word "adverse" means "causing harm" or "hostile."  *See* Merriam-Webster Dictionary (2023); Black's Law Dictionary (11th ed. 2019).  The phrase "substantially adverse" thus means harm that is considerable in quantity or amount.  It does not, however, suggest a comparison between different harms, as does the phrase "disproportionately adverse."  *Inclusive Communities*, 576 U.S. at 524.

American and non-Hispanic borrowers.  (Dkt. 522 at 35.)  Such an omission is fatal, as it effectively permitted the jury to find liability so long as Plaintiffs established any evidence of harm against African-American borrowers, regardless of whether non-African-American borrowers suffered similar harms.  This is plainly insufficient to make out a claim of disparate impact.

Even Plaintiffs' proposed instructions—which the District Court otherwise adopted almost verbatim—stated that the jury was required to find "an adverse impact that had a *disproportionate effect* on African Americans and Hispanics" in order to establish a *prima facie* case of disparate impact.  (Dkt. 486 at 4 (emphasis added).)   The District Court inexplicably *struck* the reference to "disproportionate effect" when reading its charges to the jury:

| Plaintiffs' Proposed Disparate Impact Instruction (Dkt. No. 486 at 4 (emphasis added)) | The District Court's Disparate Impact Instruction (Dkt. 522 at 35 (emphasis added)) |
|---|---|
| "First, Plaintiffs must establish by a preponderance of the evidence that Defendants' practice of making STAR NINA loans actually or predictably resulted in an adverse impact that had a *disproportionate effect* on African Americans and Hispanics." | "First, Plaintiffs must establish by a preponderance of the evidence that Defendants' practice of making STAR NINA loans actually or predictably ***had a substantial*** adverse impact ~~*that had a disproportionate effect*~~ on African American or Hispanic borrowers." |

Because the District Court struck the critical comparative element from the instructions, it is possible that the jury held Emigrant liable based only on findings that (i) some substantial number of STAR NINA borrowers were African-

American or Hispanic, and (ii) those borrowers were hurt by this type of loan. That

has *nothing* to do with racial discrimination, whether in effect or intent.[27] As this

Court in *Perricone-Bernovich* v. *Tohill* recently reaffirmed, evidence of comparative

impact is essential when making out a disparate impact claim under the FHA. 843

Fed. App'x 419, 421 (2d Cir. 2021) (dismissing plaintiffs' claims where they failed

to compare "the effect of the Defendants' policies on people [in the plaintiff's group]

. . . to the effect on the broader population"); *see also Tsombanidis*, 352 F.3d at

576–77 (requiring that plaintiffs "must first identify members of a protected group

that are affected by the neutral policy and then identify similarly situated persons

who are unaffected by the policy."). By omitting any reference to evidence of a

comparative impact, the District Court fundamentally changed the required elements

of Plaintiffs' claim.

---

[27]    The glaring error in the District Court's instruction is also apparent upon consulting Sand's model jury instructions, which similarly require that a jury find a "substantial discriminatory impact," defined as "one that affects both the plaintiff and the protected group of which he is a member in a manner plainly *disproportionate to how it affects other people*." Leonard B. Sand, et al., *Modern Federal Jury Instructions* § 87-33 (emphasis added). Consistent with the model instructions, Emigrant's proposed instructions stated that Plaintiffs must prove that Emigrant's practice or policy "had a significantly adverse or disproportionate impact on Black borrowers," which meant Plaintiffs were required to "show that a race-neutral practice or policy actually or predictably resulted in discrimination against Black borrowers." (Dkt. 484 at 8.) At trial, Emigrant's counsel repeatedly objected to the District Court's instructions on the ground that any "adverse impact" on African Americans must be "disproportionate" in comparison to the impact on other non-protected classes. (Tr. 2743:1–2744:24.)

Although the District Court's error is materially harmful in and of itself, the consequences here were particularly acute, as the jury had been presented with undisputed evidence establishing that (1) the majority of STAR NINA loans were made to white borrowers (Ex. F-7 at 2; Ex. 262; Courchane Tr. 2792:21–2793:4, 2810:5–7), and (2) out of the mouth of Plaintiffs' own expert, that STAR NINA loans were "not . . . disproportionately bad for minorities" (Ayres Tr. 372:8–10).

*Second*, the District Court did not instruct the jury that Plaintiffs had the "burden of proving an *available* alternative practice that ha[d] less disparate impact and serve[d] [Emigrant's] legitimate nondiscriminatory interests." *Mhany*, 819 F.3d at 619 (emphasis added); *see also Inclusive Communities*, 576 U.S. at 533 ("[B]efore rejecting a business justification . . . a court must determine that a plaintiff has shown that there is an *available* alternative practice that has less disparate impact and serves the entity's legitimate needs.") (internal quotation marks omitted) (emphasis added).[28] Indeed, the District Court's instructions omitted entirely the requirement that any alternative actually be available, stating only that Plaintiffs were required to establish that Emigrant's "interests could have been served *by*

---

[28]    The Department of Housing and Urban Development (HUD) has also made clear that its FHA disparate impact regulation has the same requirement: "a less discriminatory alternative . . . may not be hypothetical or speculative." *Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Solutions, LLC*, 478 F. Supp. 3d 259, 301 (D. Conn. 2020) (quoting Implementation of the FHA's Discriminatory Effects Standard, 78 Fed. Reg. at 11,473 (Feb. 15, 2013)).

*another practice that had a less discriminatory effect*." (Dkt. 522 at 35 (emphasis added).) These instructions allowed Plaintiffs to identify *any* less discriminatory alternative, including alternatives that were utterly impractical or purely theoretical. That is precisely what Plaintiffs did, asserting at trial—without any meaningful evidence—that Emigrant should have "[r]equire[d] full-income documentation on STAR loans or institute[d] a minimum credit score." (Tr. 2998:17–2999:2.) As Emigrant made clear at trial, doing away with the no-documentation and the no minimum credit features of STAR NINA loans would have precluded it from "respond[ing] to the marketplace demand for a no-income verification loan product for people with low credit scores who had both reported and unreported income." (*Id.* 3029:23–3030:5.) Accordingly, had the District Court properly instructed the jury on the correct legal standard, the jury would have known to reject Plaintiffs' suggested alternatives as mere conjecture, rather than bona fide available alternatives. *See New York City Envt'l Justice All.* v. *Giuliani*, 214 F.3d 65, 72 (2d Cir. 2000) (no available alternative where plaintiffs speculated but "presented no evidence" that their supposed "less discriminatory options" were "likely to provide a viable alternative").

       *Third*, the District Court did not instruct the jury on Plaintiffs' burden to establish a robust causal link between the challenged policy or practice and the alleged disparate impact. The Supreme Court has emphasized that "[a] robust

causality requirement ensures that racial imbalance does not, without more, establish a *prima facie* case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Inclusive Communities*, 576 U.S. at 542 (internal quotation marks omitted); *see also Boyd* v. *Lefrak Org.*, 509 F.2d 1110, 1113 (2d Cir. 1975) (requiring plaintiffs "to show that there existed some demonstrable prejudicial treatment of minorities over and above that which is the inevitable result of disparity in income"). In other words, it was important for the jury to understand that it could not find Emigrant liable for a disparate impact caused by factors outside of Emigrant's control, such as disparities in credit scores between racial groups or Plaintiffs' own financial decisions, either before or after receiving STAR NINA loans.

The District Court's instruction failed to convey this message, stating only that Plaintiffs had to show that "making STAR NINA loans actually or predictably had a substantial adverse impact on African American or Hispanic borrowers." (Dkt. 522 at 35.) This was plainly insufficient, as it did not communicate clearly (indeed, at all) that Plaintiffs needed to prove that one of Emigrant's STAR NINA policies or practices caused "some demonstrable prejudicial treatment of minorities *over and above that which is the inevitable result of disparity in [credit scores]*." *Boyd*, 509 F.2d at 1113 (emphasis added).

The Court's error was also manifestly prejudicial, as Plaintiffs' expert, Dr. Freeman, conceded that STAR NINA borrowers were more likely to have low credit scores than to live in predominantly African-American zip codes. (Freeman Tr. 1857:8–20; Ex. K-80 at -3 (showing that the incidence ratio of STAR NINA loans was more strongly correlated to credit score (1.57) than zip code (1.32) for African-American borrowers).) Thus, it was a borrower's credit score, not the racial composition of his or her neighborhood, that was the driving factor for whether they received a STAR NINA loan. (Courchane Tr. 2822:22–2823:9.) The District Court's improper jury instruction masked the gravity of these realities and permitted the jury to find liability without a robust causal link between the challenged practice and any purported disparate impact.

### B. The District Court Also Erred in Its Jury Instructions on Intentional Discrimination.

The District Court's instruction on intentional discrimination was also clearly erroneous. Over Emigrant's objection, the District Court improperly instructed the jury that "Plaintiffs [were] not required to show that Defendants acted with racial animus," but rather that "they [were] only required to show that race, color, or national origin was one motivating factor" that "need only have played some role in [Emigrant's] conduct." (Dkt. 522 at 33.) This instruction was directly contrary to binding precedent from this Court, which makes clear that to establish a *prima facie* case of intentional discrimination, Plaintiffs were required to present

-49-

evidence that "*animus* against [African-American borrowers] was a *significant factor*" in Emigrant's marketing of STAR NINA loans.  *Mhany*, 819 F.3d at 606 (emphasis added and quotation marks omitted); *see also Francis* v. *Kings Park Manor, Inc.*, 992 F.3d 67, 73–74 (2d Cir. 2021) (affirming dismissal of intentional discrimination complaint containing no factual basis to infer that the defendant "was motivated by racial animus"); *Quad Enters. Co., LLC* v. *Town of Southold*, 369 F. App'x 202, 207 (2d Cir. 2010) (affirming summary judgment for defendant because plaintiffs "ha[d] not shown animus as a significant factor").[29]  The District Court also erred when it instructed the jury that race only needed to be "one motivating factor"—rather than a "significant factor"—and to have played only "some role in [Emigrant's] conduct."  (Dkt. 522 at 33.)

---

[29]     Following the trial, the District Court defended this charge on the basis that, in *Village of Arlington Heights*, the U.S. Supreme Court described "without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed."  429 U.S. at 268.  As Emigrant explained in a letter objecting to the District Court's jury instructions (Dkt. 511), *Arlington Heights* does not support the District Court's charge.  That decision concerned a Fourteenth Amendment discrimination claim, not a claim under the FHA, ECOA, or NYCHRL.  *Arlington Heights*, 429 U.S. at 271.  Moreover, in *Arlington Heights*, the Supreme Court identified the relevant test for intentional discrimination to be "whether *invidious* discriminatory purpose was a motivating factor."  *Id.* at 266 (emphasis added).  The phrase "motivated, at least in part, by race, color, or national origin" does not appear in the *Arlington Heights* decision, and certainly does not match *Arlington Heights*' requirement of proof of "invidious" discrimination.

The District Court's error was undoubtedly prejudicial. At trial, Plaintiffs attempted to demonstrate that Emigrant sent specifically targeted advertisements to African-American and Hispanic communities as evidence of Emigrant's racially motivated conduct. Emigrant effectively rebutted this argument at trial by showing that (1) Emigrant's advertising budget was "negligible" (Chiagouris Tr. 2562:20–21); (2) none of Plaintiffs had ever seen an Emigrant advertisement or had any contact with Emigrant prior to applying for a loan (Howell Tr. 310:23–311:6; B. Small Tr. 1140:12–25; J. Small Tr. 1326:18–1327:2; E. Saint-Jean Tr. 1418:17–25; J. Saint-Jean Tr. 1581:24–1582:9; Commodore Tr. 1719:9–14; Y. Saintil Tr. 1801:23–1802:3); (3) STAR NINA loans were offered to borrowers primarily based on their credit score, not their ethnic background (Freeman Tr. 1857:8–20; Ex. K-80 at -2, -3); and (4) the majority of STAR NINA loans were made to white borrowers (Ex. F-7 at 2; Ex. 262; Courchane Tr. 2792:21–2793:4, 2810:5–7). Thus, even if the jury could plausibly have found that, because Emigrant did advertise in minority neighborhoods, race "played some role" in Emigrant's marketing decisions, that is far from a finding—based on a proper jury instruction—that racial animus was a "significant factor" in Emigrant's conduct. The District Court thus erred on instructing the jury as to Plaintiffs' burden of proof on these elements.

-51-

### III. THE DISTRICT COURT ERRED IN FINDING THAT THE RELEASE AGREEMENT SIGNED BY THE SAINTILS WAS UNENFORCEABLE AS AGAINST PUBLIC POLICY.

On the basis of the evidence at trial, the jury found that the Saintils had "knowingly and voluntarily agreed to release their claims against Emigrant" when—while represented by ACORN—they entered into an agreement with Emigrant to modify their loans. (Dkt. 518 at 2.) The jury awarded the Saintils no damages as a result. *Id.* However, on Plaintiffs' post-trial motion under Rules 50 and 59, the District Court overruled the jury and held that the release was unenforceable as a matter of public policy. The District Court's ruling is contrary to controlling law, and should be reversed.

The District Court erred because the release violated no "public policy." The Supreme Court has held that, although "the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy." *Muschany* v. *U.S.*, 324 U.S. 49, 66 (1945). This Court has similarly held that public policy "is typically found in the Constitution, treaties, federal statutes and regulations, and court cases." *Thomas James Assocs.* v. *Jameson*, 102 F.3d 60, 66 (2d Cir. 1996). Here, by contrast, the District Court based its decision on a portion of its 2014 denial of Emigrant's motion to dismiss, in which the District Court "provid[ed] a historical overview of mortgage lending in the United States" in combination with its reading

-52-

of the purposes of the FHA, ECOA, and NYCHRL.  (Dkt. 618 at 29–30.)  However, the District Court cited no authority in those statutes or history that would give rise to a public policy that would render all otherwise valid releases entered into by members of protected classes unenforceable.  And for good reason, as such a public policy rational would discourage settlement of mortgage lending disputes, avoiding the cost and risks of trial, to the detriment of both the borrower and lender.

The District Court's decision voiding the release disregards a body of precedent from this Court recognizing the well-settled public policy in favor of settling disputes.  *See Anita Founds*, 902 F.2d at 190 ("The Fund's post-settlement posture flies in the face of the strong public policy favoring settlements.  Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence.") (citations omitted); *ABKCO Music, Inc.* v. *Harrisongs Music, Ltd.*, 722 F.2d 988, 997 (2d Cir. 1983) ("As a general matter, we note first that courts favor the policy of encouraging voluntary settlement of disputes.").  The same policy controls even in cases where courts are asked to uphold waivers and releases of discrimination claims.  *See, e.g.*, *Rockmore* v. *Antell*, 2008 WL 4443951, at *4 n.3 (S.D.N.Y. Sept. 25, 2008) (holding that "New York courts have expressly rejected the view that releases, insofar as they involve allegations of discrimination, are disfavored as a matter of law and are, consequently to be treated dissimilarly from contractual

releases in general.") (internal quotation marks and citation omitted), *aff'd*, 353 F. App'x 517 (2d Cir. 2009). The District Court disregarded this established policy—and committed reversible error—when it reversed the jury's finding that the Saintils knowingly and voluntarily released their claims.

## CONCLUSION

For the reasons set forth above, this Court should reverse the Judgment on the grounds that Plaintiffs' claims were time barred under the applicable statutes of limitation. In the alternative, this Court should vacate the Judgment and order a new trial on the grounds that the jury instructions on disparate impact and/or intentional discrimination were flawed. In the further alternative, this Court should reverse the Judgment as to Felex and Yanick Saintil on the grounds that their claims were validly released.

Respectfully submitted,

Dated: March 17, 2023

EVANDRO C. GIGANTE
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
(212) 969-3000

/s/ *Matthew A. Schwartz*
RICHARD H. KLAPPER
MATTHEW A. SCHWARTZ
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Attorneys for Defendants-Appellants*
*Emigrant Mortgage Company, Inc. and Emigrant Bank*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A).   It contains 14,000 or fewer words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6).   It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: March 17, 2023

/s/ *Matthew A. Schwartz*
Matthew A. Schwartz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
