# 22-3094

**IN THE**
**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

JEAN ROBERT SAINT-JEAN, EDITH SAINT-JEAN, FELEX SAINTIL, YANICK SAINTIL, LINDA COMMODORE, BEVERLY SMALL, JEANETTE SMALL, FELIPE HOWELL, JR., AS ADMINISTRATOR OF THE ESTATE OF FELIPE R. HOWELL,

*Plaintiffs – Appellees*,

FELIPE HOWELL,

*Plaintiff*,

v.

EMIGRANT MORTGAGE COMPANY, INC. AND EMIGRANT BANK

*Defendants – Appellants,*

EMIGRANT SAVINGS BANK-MANHATTAN, EMIGRANT BANCORP, INC.,

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**PAGE PROOF BRIEF FOR PLAINTIFFS–APPELLEES**

Lila R. Miller
Tara K. Ramchandani
Yiyang Wu
Edward K. Olds
RELMAN COLFAX PLLC
1225 19th Street, NW Suite 600
Washington, D.C. 20036
(202) 728-1888

Rachel Geballe
BROOKLYN LEGAL SERVICES
105 Court Street, Fourth Floor
Brooklyn, NY 11201
(718) 237-5500

*Counsel for Plaintiffs – Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE.............................................................2

SUMMARY OF ARGUMENT ..............................................................9

ARGUMENT .....................................................................................11

   I.  Standard of Review ................................................................11

   II. The District Court Properly Deemed Plaintiffs' Claims Timely .............12

      A. Considering the Equities, Emigrant Cannot Show an Abuse of Discretion to Overturn the Application of Equitable Tolling .............13

         1. The Circumstances of Emigrant's Systemic Discrimination Prevented Plaintiffs from Learning of Their Claims .....................14

         2. The Propriety of Tolling Is Confirmed by Emigrant's Concealment...................................................................................19

         3. Plaintiffs Acted Diligently upon Learning of Their Causes of Action .............................................................................................25

      B. The District Court Properly Applied the Discovery Rule...................28

   III. The District Court Correctly Charged the Jury on Disparate Impact ......31

      A. Emigrant Has Not—and Cannot—Demonstrate Fundamental Error...................................................................................32

      B. The District Impact Instruction Properly Applied the Governing Framework...............................................................................35

         1. The Jury Charge Captured the Comparative Aspect of a Disparate Impact Claim .................................................................................35

i

      2.   The Jury Charge Correctly Captured Causation ...........................39

      3.   The Jury Charge Properly Articulated the Less Discriminatory
         Alternative Standard.......................................................................41

   C.  Regardless of Any Error, the Disparate Impact Instruction Did Not
       Prejudice Emigrant ............................................................................43

IV. The District Court Properly Instructed the Jury on
    Disparate Treatment ................................................................................46

V.  The NYCHRL Provides an Independent Basis for Affirmance..............51

VI. The District Court Correctly Set Aside a Waiver of Claims in the
    Saintils' Loan Modification Because It Was Void as Against State and
    Federal Public Policy...............................................................................53

CONCLUSION ..............................................................................................58

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
  722 F.2d 988 (2d Cir. 1983) ..............................................................56

*Aguirre v. Turner Constr. Co.*,
  582 F.3d 808 (7th Cir. 2009) .............................................................24

*Andrews v. Freemantlemedia N.A., Inc.*,
  No. 13 CIV. 5174, 2014 WL 6686590 (S.D.N.Y. Nov. 20, 2014),
  *aff'd*, 613 F. App'x 67 (2d Cir. 2015)................................................31

*Anita Founds., Inc. v. ILGWU Nat. Ret. Fund*,
  902 F.2d 185 (2d Cir. 1990) ..............................................................56

*AXA Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*,
  890 F. Supp. 2d 373 (S.D.N.Y. 2012) ................................................57

*Bangerter v. Orem City Corp.*,
  46 F.3d 1491 (10th Cir. 1995) ...........................................................48

*Barkley v. Olympia Mortg. Co.*,
  No. 04-CV-875, 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007)...........16, 20, 26

*Barrett v. U.S.*,
  689 F.2d 324 (2d Cir. 1982) ..............................................................28

*Boyd v. Lefrak Org.*,
  509 F.2d 1110 (2d Cir. 1975) ............................................................41

*Boykin v. KeyCorp*,
  521 F.3d 202 (2d Cir. 2008) ..............................................................48

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
  331 F.3d 342 (2d Cir. 2003) ..............................................................13

*Cerbone v. Int'l Ladies' Garment Workers' Union*,
  768 F.2d 45 (2d Cir. 1985) ................................................................31

*Chalmers v. Mitchell*,
  73 F.3d 1262 (2d Cir. 1996) ..............................................................38

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
746 F.3d 42 (2d Cir. 2014) ........................................................51

*Clark v. Chase Bank US, N.A.*,
643 F. App'x 838 (11th Cir. 2016) ..............................................18

*Clement v. United Homes, LLC*,
914 F. Supp. 2d 362 (E.D.N.Y. 2012) ....................................30, 31

*Clement v. United Homes, LLC*,
No. 10-CV-2122, 2014 WL 3014695 (E.D.N.Y. July 3, 2014) ........27

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
421 F.3d 170 (3d Cir. 2005) ...................................................48, 50

*Cobar v. Drug Enf't Admin.*,
600 F. App'x 31 (2d Cir. 2015) ...................................................13

*Congregation Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*,
945 F.3d 83 (2d Cir. 2019) .........................................................28

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
478 F. Supp. 3d 259 (D. Conn. 2020).........................................42

*Council v. Better Homes Depot, Inc.*,
No. 04-CV-5620, 2006 WL 2376381 (E.D.N.Y. Aug. 16, 2006) ..........16, 20, 25

*DeGaetano v. Smith Barney, Inc.*,
983 F. Supp. 459 (S.D.N.Y. 1997) ..............................................54

*Valdez ex rel. Donely v. United States*,
518 F.3d 173 (2d Cir. 2008) .........................................15, 18, 23, 28

*Emamian v. Rockefeller Univ.*,
971 F.3d 380 (2d Cir. 2020) .......................................................38

*In re Estate of Walker*,
476 N.E.2d 298 (N.Y. 1985)...................................................53, 54

*Francis v. Kings Park Manor*,
992 F.3d 67 (2d Cir. 2021) ......................................................49, 50

iv

*Gillespie v. Sears, Roebuck & Co.*,
   386 F.3d 21 (1st Cir. 2004)................................................................51

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971)........................................................................41

*Grimes v. Fremont Gen. Corp.*,
   785 F. Supp. 2d 269 (S.D.N.Y. 2011) ...............................................18

*Hargraves v. Capital City Mortg. Corp.*,
   140 F. Supp. 2d 7 (D.D.C. 2000)......................................................45

*Howard Johnson Int'l Inc. v. HBS Family, Inc.*,
   No. 96 CIV. 7687, 1998 WL 411334 (S.D.N.Y. July 22, 1998)..............57

*Huntington Branch, NAACP v. Town of Huntington*
   844 F.2d 926 (2nd Cir. 1988) ...............................................36, 41, 45

*Jones v. Ford Motor Credit Co.*,
   No. 00-CIV-8330, 2002 WL 88431 (S.D.N.Y. Jan. 22, 2002)............16, 29

*Jordan v. Chase Manhattan Bank*,
   No. 13 CIV. 9015, 2014 WL 3767010 (S.D.N.Y. July 31, 2014).............18

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) .............................................................34

*Kaiser-Frazer Corp. v. Otis & Co.*,
   195 F.2d 838 (2d Cir. 1952) .............................................................54

*Kassman v. KPMG LLP*,
   No. 11 CIV. 03743, 2015 WL 5178400 (S.D.N.Y. Sept. 4, 2015) .......13, 26

*Kregos v. Assoc. Press*,
   3 F.3d 656 (2d Cir. 1993) .............................................................11, 13

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998) .........................................................11, 28, 31

*Laflamme v. New Horizons, Inc.*,
   605 F. Supp. 2d 378 (D. Conn. 2009)................................................48

*LeBlanc-Sternberg v. Fletcher,*
    67 F.3d 412 (2d Cir. 1995) ...................................................28

*Loeffler v. Staten Island Univ. Hosp.,*
    582 F.3d 268 (2d Cir. 2009) .................................................52

*M & T Mortg. Corp. v. White,*
    736 F. Supp. 2d 538 (E.D.N.Y. 2010) ....................................15, 16, 20

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.,*
    290 F.3d 98 (2d Cir. 2002) .................................................32, 34

*Meyer v. Holley,*
    537 U.S. 280 (2003)..........................................................24

*MHANY Mgmt., Inc. v. Cnty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016) .....................................................*passim*

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
    715 F.3d 102 (2d Cir. 2013) .................................................52

*Ojeda v. Metro. Transp. Auth.,*
    41 F.4th 56 (2d Cir. 2022) ..................................................12

*Paolino v. Paolino,*
    420 A.2d 830 (R.I. 1980).....................................................54

*Patrolmen's Benevolent Ass'n of City of New York v. City of New
    York,*
    310 F.3d 43 (2d Cir. 2002) ..................................................38, 44

*Perricone-Bernovich v. Tohill,*
    843 F. App'x 419 (2d Cir. 2021) ...........................................39

*Phillips v. Better Homes Depot, Inc.,*
    No. 02-CV-1168, 2003 WL 25867736 (E.D.N.Y. Nov. 12, 2003)........16, 19, 29

*Quad Enters. Co., LLC v. Town of Southold,*
    369 F. App'x 202 (2d Cir. 2010) ...........................................50

*Quad Enters. Co., LLC v. Town of Southold,*
    No. 05-CV-3776, 2009 WL 10701692 (E.D.N.Y. July 1, 2009) ......................50

*Robinson v. 12 Lofts Realty, Inc.*,
  610 F.2d 1032 (2d Cir. 1979) ....................................................................49, 50

*Rockmore v. Antell*,
  No. 07 Civ. 3592, 2008 WL 4443951 (S.D.N.Y Sept. 25, 2008)......................57

*Rotella v. Wood*,
  528 U.S. 549 (2000)..............................................................................................30

*Shade v. Hous. Auth. of City of New Haven*,
  251 F.3d 307 (2d Cir. 2001) ........................................................................11, 33

*Stamford Bd. of Educ. v. Stamford Educ. Ass'n*,
  697 F.2d 70 (2d Cir. 1982) ...................................................................................54

*State of N.Y. v. Hendrickson Bros., Inc.*,
  840 F.2d 1065 (2d Cir. 1988) ...............................................................................15

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water
  Improvement Dist.*,
  17 F.4th 950 (9th Cir. 2021) .................................................................................50

*Teasdale v. New York City Fire Dep't*,
  574 F. App'x 50 (2d Cir. 2014) ............................................................................52

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015)..............................................................................35, 36, 48

*Thomas James Assoc., Baker v. F & F Inv.*,
  339 F. Supp. 942 (S.D.N.Y.), *aff'd*, 470 F.2d 778 (2d Cir. 1972).....................54

*Thomas James Assoc., Inc. v. Jameson*,
  102 F.3d 60 (2d Cir. 1996) ...................................................................................54

*Thompson v. Metro. Life Ins. Co.*,
  149 F. Supp. 2d 38 (S.D.N.Y. 2001) ....................................................................29

*Travelers Indem. Co. v. Scor Reinsurance Co.*,
  62 F.3d 74 (2d Cir. 1995) ...............................................................................33, 34

*Tsombanidis v. West Haven Fire Dep't*,
  352 F.3d 565 (2d Cir. 2003) .................................................................................39

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014) ...................................................... 11, 43

*United States v. Twenty Miljam-350 IED Jammers*,
   669 F.3d 78 (2d Cir. 2011) ............................................................. 12

*United States v. Pelzer Realty Co.*,
   484 F.2d 438 (5th Cir. 1973) ......................................................... 49

*United States v. Space Hunters, Inc.*,
   429 F.3d 416 (2d Cir. 2005) ........................................................... 48

*Veltri v. Bldg. Serv. 32B-J Pension Fund*,
   393 F.3d 318 (2d Cir. 2004) ...................................................*passim*

*Vill. of Bellwood v. Dwivedi*,
   895 F.2d 1521 (7th Cir. 1990) ....................................................... 49

*Walters v. Fullwood*,
   675 F. Supp. 155 (S.D.N.Y. 1987) ................................................. 57

*Weiss v. La Suisse*,
   141 F. App'x 31 (2d Cir. 2005) ........................................... 43, 44, 46

*Williams v. Matthews Co.*,
   499 F.2d 819 (8th Cir. 1974) ......................................................... 49

**Statutes**

15 U.S.C. 1691e .................................................................................. 25

15 U.S.C. § 1639c .............................................................................. 55

42 U.S.C. § 3604 ............................................................................... 47

42 U.S.C. § 3613 ........................................................................ 25, 48

Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq* ...................*passim*

Fair Housing Act, 42 U.S.C. § 3601 *et seq* ....................................*passim*

N.Y.C. Admin. Code § 8-502 ............................................................ 25

New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ...............*passim*

**Other Authorities**

24 C.F.R. § 100.500 ......................................................................35, 37, 42

Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed.
  Reg. 19450 (Mar. 31, 2023)...................................................40, 42, 46

3 NYCRR 419.7 ......................................................................................55

Dec. 15, 2009 Industry Announcement ...................................................55

Fannie Mae Legal Documents New & Updates Archive .........................56

FHA Single Family Housing Policy Handbook 4000.1 ..........................56

Fed. R. Civ. P. 51 ...................................................................................32

Home Affordable Modification Program,
  Supplemental Directive 09-01 ...........................................................56

Restatement (Third) of Agency § 1.01 cmt. c (2006).............................24

# <u>STATEMENT OF THE ISSUES</u>

I.     Whether the district court abused its discretion by applying the equitable tolling doctrine when Plaintiffs were reasonably prevented from learning of their systemic discrimination claims during the statutory period?

II.    Whether the district court erred in applying the discovery rule to defer accrual of Plaintiffs' claims when Plaintiffs did not discover their discrimination-based injuries until after the statutory period?

III.   Whether Emigrant has demonstrated a fundamental error undermining the integrity of the trial such that this Court can review unpreserved objections to the jury charge?

IV.   Whether the district court erred in instructing the jury on disparate impact using language directly from this Court's precedent and the applicable regulation?

V.    Even if this Court finds some flaw in the wording of the disparate impact jury instruction, whether Emigrant has demonstrated prejudice considering the jury charge and the trial record as a whole?

VI.   Whether the district court erred when it instructed the jury, consistent with statutory text and existing precedent, that animus is not required for disparate treatment claims under the Fair Housing Act, the Equal Credit Opportunities Act, and the New York City Human Rights Law?

VII.  Whether this Court should overturn the district court's conclusion that the waiver of claims in Felex and Yanick Saintils' loan modification was void as against public policy?

## STATEMENT OF THE CASE

Plaintiffs–Appellees ("Plaintiffs" or "Appellees") are eight African American and Hispanic borrowers who lost hundreds of thousands of dollars in home equity, and four of whom lost their homes entirely, after receiving a discriminatory mortgage from Defendants–Appellants Emigrant Mortgage Company and Emigrant Bank (collectively, "Emigrant"). Emigrant's "STAR NINA" loans had uniquely harmful terms, many of which were concealed from borrowers at closing. But these were not just costly mortgages—they were discriminatory mortgages. A jury found that Emigrant designed its STAR NINA refinance program with the purpose and effect of targeting minority borrowers like Appellees. Appellees were prevented from discovering this systemic discrimination because they did not have access to Emigrant's marketing or loan data, nor did they know other similarly situated borrowers. But what was imperceptible to individuals is, as a jury found, unambiguous in the aggregate.

In 2016, following six weeks of evidence, a federal jury determined that Emigrant violated the Fair Housing Act (FHA), the Equal Credit Opportunity Act (ECOA), and the New York City Human Rights Law (NYCHRL) and awarded almost a million dollars in damages. The district court affirmed the liability verdict and ordered a damages-only retrial. In 2019, the second jury again awarded

Plaintiffs nearly three-quarters of a million dollars in damages. Emigrant now appeals the 2016 liability verdict against it. The relevant facts are as follows.

Emigrant introduced its STAR NINA mortgage lending program in 1999, (Tr. at 550[1]), and the evidence at trial showed that it was hallmarked by a combination of four unusual characteristics. First, Emigrant underwrote STAR NINA loans without obtaining any information about borrowers' income, assets, or ability to repay the loan. (Tr. at 69, 814–28, 961–62). Hence the product name: NINA stands for no income, no asset. (*Id.* at 69). Second, to be eligible for a STAR NINA loan, a borrower needed a credit score of 600 or below. (*Id.* at 2162). The average credit score for STAR NINA borrowers was 541. (*Id.* at 462). Third, if a borrower missed even one payment, Emigrant imposed a default interest rate of 18%, a practice almost unheard of in the consumer mortgage industry. (*Id.* at 84–85; Ex. P-2; Ex. P-118 at EMC2_368793). Fourth, Emigrant required a loan-to-value (LTV) ratio of about 50%, meaning that the homeowner already had a large amount of equity in the property. (*Id.* at 1637–38). As the jury heard, the high level of equity and default interest rate allowed Emigrant to turn a profit when borrowers fell behind or lost their homes to foreclosure. (*Id.*; *see also id.* at 80–81).

---

[1] Unless otherwise indicated, references to "Tr." and "Ex." are to the trial transcripts and exhibits from the 2016 trial.

These four features not only defined STAR NINA loans—they rendered the product predatory according to the experts who testified. (Tr. at 58, 75–76, 83, 328–31, 337–39, 346–52, 435–38, 1958–68). Predatory loans are those more likely to benefit the bank at the expense of a borrower or to result in foreclosure. (*Id.* at 73–74, 324–25, 1960–61). Emigrant's own data showed that 95.4% of STAR NINA loans had predatory terms, and these loans were 1.5 times more likely to result in foreclosure than other loans. (*Id.* at 352–54).

STAR NINA loans failed with such frequency because they were unaffordable to the borrowers who received them at origination—let alone when the interest rate jumped to 18%—which Emigrant knew. (*Id.* at 109–10, 117–18, 123–24, 128; Ex. P-170; Ex. P-571A). Emigrant's records showed that NINA loans had staggering delinquency rates, far higher than other subprime mortgages, and that Emigrant tracked these bad outcomes. (Tr. at 86–87, 1966; Ex. P-58; Ex. P-60; Ex. P-118; Ex. P-322).

STAR NINA loans stripped borrowers of their equity, and many minority borrowers, like Plaintiffs, emerged in worse positions than when they first encountered Emigrant. (Tr. at 205–06; *Id.* at 101, 110, 115, 120, 126, 208, 1096–97, 1500–01, 1710–11; Ex. P-550; Ex. P-551). As noted by Plaintiffs' statistical expert, Yale University Professor Ian Ayres, delaying foreclosure because of a

STAR NINA refinance allowed Emigrant to "eat up" borrowers' equity such that borrowers recouped less from eventual foreclosure sales. (Tr. at 441).

The story of Plaintiff Felipe Howell illustrates this all-too-common STAR NINA arc: Mr. Howell bought his house in Jamaica, Queens in 1979 and spent thirty years paying down his mortgage. (*Id.* at 230). When he encountered Emigrant in early 2008, the house was worth $430,000 and had just a $6,000 lien on it, meaning that Mr. Howell had amassed $424,000 in equity. (*Id.* at 101, 103, 231, 2511–12). Mr. Howell was retired, and his home, his "castle" as he called it, was his largest asset. (*Id.* at 231–32). Emigrant approved Mr. Howell for a loan of $200,750 with a high initial interest rate of 10.375% and imposed a default interest rate of 18% in May 2008 when Mr. Howell fell behind on payments. (Ex. D48 at 13; Tr. at 239). By August 2009, Emigrant had taken the home in a foreclosure auction. (Ex. D48 at 13). Mr. Howell was evicted and received no proceeds from the sale. (Tr. at 251). Outcomes like these explain why Emigrant's Board of Directors viewed STAR NINA loans as "very secure and highly profitable" for the bank. (Ex. P-161 at 5).

The trial record confirms that Emigrant disproportionately wrote STAR NINA loans in communities of color, like those where Plaintiffs lived. Plaintiffs' experts, Dr. Ayres and Columbia University Professor Lance Freeman, testified that the proportion of Emigrant's refinance loans that were STAR NINA loans

increased as the percentages of African Americans and Hispanics ("minorities") in a census tract increased. (Tr. at 353–54, 1834). In census tracts that were 0–10% minority, 23% of the refinance loans were STAR NINA, but in census tracts that were 80–100% minority 45% of the refinance loans were STAR NINA. (*Id.*) A statistically significant disparity persisted, even when controlling for non-race factors, such as credit score. (*Id.* at 1844–84). Emigrant's expert, Dr. Marsha Courchane, agreed that the higher the percentage of minorities in a census tract, the higher the percentage of STAR NINA loans in that tract. (*Id.* at 2816, 2960–61). A July 2006 email among senior management at Emigrant recognized these racial disparities, noting that African American borrowers had higher priced loans than white borrowers because a greater percentage of African American loan applicants were sold STAR NINA loans. (Ex. P-262). The adverse impact was also confirmed by other Emigrant employees, who testified that, as a proportion, more African American borrowers received STAR NINA loans. (Tr. at 943, 2210–18, and 2227).

This racial disparity was by design: Emigrant CEO Howard Milstein testified that he knew that Emigrant programs targeted specific ethnic groups, and Catherine Cellamare, Vice President for Marketing, acknowledged that Emigrant used images of minorities in its advertising to "appeal to the readership" of ethnic publications. (Tr. at 567–68, 1059). Plaintiffs' advertising expert, NYU Professor Charlton McIlwain testified that during the height of the STAR NINA program

76% of Emigrant's advertising dollars went to four newspapers—*Caribbean Life*, *Black Star*, *Hoy*, and *Mi Zona Hispana*—that were distributed to an almost exclusively African American or Hispanic readership, and 83% of the money spent specifically on Emigrant's STAR NINA advertising went to those papers. (*Id.* at 1222–23, 1243–45, 1264; Ex. H1). Professor McIlwain also found that virtually all of Emigrant's advertising images were of minority families. (Tr. at 1223, 1238–39, and 1241). Tellingly, Emigrant spent tens of thousands of dollars per year in the four ethnic papers when it was marketing the STAR NINA loan program, but in 2009, the year after Emigrant terminated its STAR NINA program, its advertising in the ethnic papers dropped to just $200. (*Id.* at 1229–30).

Emigrant discontinued the STAR NINA program because state regulators prohibited the continued use of a critical feature of the program—the 18% default interest rate. (Tr. 592–93; Ex. P-118 at EMC2_368794 (regulatory report finding that STAR NINA targeted a particular group of consumers for foreclosure); Ex. P502A (Board meeting minutes noting that Emigrant had ended the STAR NINA program due to its regulator's criticism of the Bank's use of an 18% default interest rate rider in the program)).

Plaintiffs testified that they did not learn of the discriminatory nature of STAR NINA loans until years later. (Tr. at 253, 669, 1824–27, 1098–99, 1313, 1382, 1497–98, 1709–10). Emigrant contributed to this delay by concealing some

of the most damaging terms. (*Id.* at 97–98, 334–35; Ex. P-118 at EMC2_368794; *see also infra* Section II.A). Indeed, all Plaintiffs shared similar stories about being rushed through closing and not understanding the terms or costs of their Emigrant loans. (*See infra* Section II.A.2).

Plaintiffs are African American and Hispanic borrowers who reside in the communities that Emigrant targeted. (Tr. at 1895–96). They owned their homes for anywhere from five to thirty years before receiving a STAR NINA loan, and most lost their homes or had foreclosures initiated within two years of their Emigrant originations. (Tr. at 634, 662 (Saintils); *id.* at 1362, 1495 (Saint-Jeans); *id.* at 1069, 1181 (Smalls); *id.* at 230, 307 (F. Howell); *id.* at 1683, 1707–08 (L. Commodore)). Even now, Plaintiffs Edith and Jean Robert Saint-Jean and Felex and Yanick Saintil remain in foreclosure proceedings.[2] (*Id.*) If Emigrant prevails, it will claim the proceeds from the sale of these homes, reflecting a loss of over half a million in equity. (Ex. P-551 (Saintils' loan statement); Ex. P-550 (Saint-Jeans' loan statement)). All Plaintiffs testified about the despair and indignities of losing their homes and equity and of suffering discrimination. (Tr. at 253–54 (F. Howell); *id.* at 669–70, 776, and 794 (F. Saintil); *id.* at 1099–1100 (B. Small); *id.* at 1352–53 (J.

---

[2] The Saintils were able to delay foreclosure by seeking modifications to their original STAR NINA loans, though not even the modifications benefitted them. For example, their 2010 modification purported to release all claims against Emigrant, capitalized their arrears, including some interest accrued due to the 18% default interest rate. (Tr. at 759, 1778–79, 1821–26.)

Small); *id.* at 1365 (E. Saint-Jean); *id.* at 1498–99 (J. Saint-Jean); *id.* at 1702–03 and 1710 (L. Commodore); *id.* at 1780–81 and 1793 (Y. Saintil)).

Plaintiffs initiated this action in 2011. (Dkt. 1). The district court denied Emigrant's motions to dismiss and for summary judgment. (*See* Dkt. 258; Feb. 26, 2016 Hr'g Tr.). In 2016, a federal jury heard the above evidence and unanimously found that Plaintiffs had proven that Emigrant discriminated against them in violation of the FHA, ECOA, and NYCHRL. (Dkt. 518). The jury awarded $950,000 to six of the Plaintiffs, but the jury could not consider damages for the Saintils because it found that they had knowingly waived their claims as part of a loan modification. (*Id.*) Following post-trial briefing, the district court affirmed the jury's liability verdict, deemed the Saintils' waiver was void as a matter of law, and ordered a damages-only retrial for all Plaintiffs. (Dkt. 618). A second federal jury trial took place in 2019 and resulted in $722,044 for the four Plaintiffs who already lost their homes and nominal damages for the four Plaintiffs who remain in foreclosure proceedings. (Dkt. 732). Emigrant noticed this appeal on December 7, 2022. (Dkt. 781).

## SUMMARY OF ARGUMENT

The district court properly denied Emigrant's post-trial motions under Federal Rules of Civil Procedure 50 and 59 and properly granted Plaintiffs' Rule 50 motion as to the legal enforceability of the Saintils' waiver. The district court's

conclusions were supported by a comprehensive review of the trial record and binding precedent and should be affirmed by this Court. Emigrant's arguments on appeal—to the extent they were preserved—misstate the applicable legal standards and ignore voluminous evidence favoring the jury's liability verdict.

The district court did not abuse its discretion when it determined that the circumstances at issue merit equitable tolling, and it correctly applied the discovery rule. Plaintiffs assert discrimination-based claims arising from Emigrant's practice of writing a disproportionate number of STAR NINA loans to minority borrowers. Because Emigrant's systemic discrimination was not perceptible to individual borrowers, Plaintiffs were prevented from learning of their claims during the statutory period. Especially considering Emigrant's active concealment of predatory loan terms, the district court's assessment of the equities should remain intact.

The district court also properly instructed the jury on disparate impact. Emigrant has waived many of its challenges to the disparate impact instruction, but whether evaluated for fundamental error or harmless error, the charge must be affirmed because it correctly articulated the applicable standard and because the record confirms that Emigrant faced no prejudice.

Similarly, the disparate treatment charge properly instructed the jury to evaluate whether Emigrant was motivated in part by race. Emigrant's claim that

animus must be a significant factor is nothing but an invitation to create a circuit split based on a position that has no home in the statutory text or the cases that apply it.

Finally, the district court rightly concluded that a waiver in the Saintils' loan modification was void as against public policy, which has consistently disfavored claim releases in home mortgage modifications.

## ARGUMENT

### I. Standard of Review

For Emigrant's timeliness arguments, the district court's application of equitable tolling is reviewed for abuse of discretion, *Kregos v. Assoc. Press*, 3 F.3d 656, 661 (2d Cir. 1993), and its application of the discovery rule is reviewed *de novo*, *Kronisch v. United States*, 150 F.3d 112, 120 (2d Cir. 1998).[3] For Emigrant's challenges to the jury charges on disparate impact and disparate treatment, unpreserved objections must satisfy the fundamental error standard, *Shade v. Hous. Auth. of City of New Haven*, 251 F.3d 307, 312–13 (2d Cir. 2001), and even timely raised objections require a showing of prejudicial error, *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 152–53 (2d Cir. 2014).

---

[3] None of the cases Emigrant cites for the applicable standard of review concerns equitable tolling or the discovery rule.

Because Emigrant's arguments as to timeliness and the jury instructions are appeals of its motion under Rules 50 and 59, the Court must consider "the evidence in the light most favorable" to Appellees, giving them "the benefit of all reasonable inferences that the jury might have drawn in [their] favor from the evidence." *Ojeda v. Metro. Transp. Auth.*, 41 F.4th 56, 63 (2d Cir. 2022) (citations omitted) (quotations marks omitted).

Finally, the enforceability of the Saintils' waiver is a legal question that is reviewed *de novo*. *See, e.g.*, *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 87 (2d Cir. 2011).

## II. <u>The District Court Properly Deemed Plaintiffs' Claims Timely</u>

The district court properly determined that Plaintiffs' claims are timely pursuant to equitable tolling and the discovery rule. Although the two doctrines are different, both apply here because the circumstances surrounding Plaintiffs' claims of systemic discrimination, coupled with Emigrant's affirmative concealment, prevented Plaintiffs from initiating this action during the statutory period.[4]

---

[4] Even if the Court reverses the district court's finding of timeliness, remand would be required to determine whether Plaintiffs' claims are timely under the continuing violation doctrine, an issue the district court declined to reach. (*See* Dkt. 258 at 33–34).

### A. Considering the Equities, Emigrant Cannot Show an Abuse of Discretion to Overturn the Application of Equitable Tolling

The doctrine of equitable tolling allows district courts to extend the statute of limitations "as necessary to avoid inequitable circumstances." *Kassman v. KPMG LLP*, No. 11 CIV. 03743, 2015 WL 5178400, at *3 (S.D.N.Y. Sept. 4, 2015) (citing *Iavorski v. I.N.S.*, 232 F.3d 124, 129 (2d Cir. 2000)). A plaintiff is entitled to equitable tolling where she was prevented from filing a timely claim despite acting with reasonable diligence. *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322–23 (2d Cir. 2004).

The district court weighed the equities and determined, on four separate occasions, that the statutes of limitations for Plaintiffs' claims should be equitably tolled: in denying Emigrant's motion to dismiss, in denying Emigrant's motion for summary judgment, again at the close of trial, and a fourth time in its post-trial order. (Dkt. 258 at 29–33; Feb. 26, 2016 Hr'g Tr. at 23–25, 49–50, 54; Tr. at 1982–83, 1989–90, 3156; Dkt. 618 at 26–27).

The decision to equitably toll "should not be disturbed absent an abuse of that discretion" and is one that "is left to the sound discretion of the district court." *Kregos*, 3 F.3d at 661; *see also Cobar v. Drug Enforcement Admin.*, 600 F. App'x 31, 32 (2d Cir. 2015). Such an abuse occurs only "when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d

342, 348 (2d Cir. 2003). Emigrant has not pointed to a single case in which this Court has held that a district court abused its discretion by equitably tolling a statute of limitations, confirming the wide latitude this Court affords in making these fact-sensitive determinations.

For three reasons, the district court did not abuse its discretion by tolling Plaintiffs' claims. First, the circumstances reasonably prevented Plaintiffs from learning of Emigrant's discriminatory conduct during the statutory period. Second, the equities favor Plaintiffs when considering the evidence of Emigrant's active concealment and fraud. Third, Plaintiffs acted with diligence upon learning that their mortgages were discriminatory, not just costly.

1. *The Circumstances of Emigrant's Systemic Discrimination Prevented Plaintiffs from Learning of Their Claims*

This Court's precedent permits application of equitable tolling where a reasonable person would not have been able to timely file their claim. That is the case here. Plaintiffs' claims are not merely that they got bad loans—they contend that they got *discriminatory* loans pursuant to Emigrant's systemic misconduct, which they reasonably could not detect until after the statutory period.

This Court has explained that equitable tolling may apply not only "[w]here defendant is responsible for concealing the existence of plaintiff's cause of action" but also where, even in the absence of overt action by the defendant, "[a] plaintiff was somehow prevented from learning of her cause of action within the statutory

14

period." *Veltri*, 393 F.3d at 322–33.[5] This Court's decision in *Valdez ex rel. Donely v. United States* is instructive. 518 F.3d 173, 182–83 (2d Cir. 2008). There, a plaintiff with a medical malpractice claim did not know that, by virtue of the hospital's funding stream, the defendant–doctor qualified as a federal employee. *Id.* at 176. The plaintiff thus did not timely exhaust her administrative remedies before filing suit. *Id.* The hospital did nothing to conceal the federal status of its doctors, but this Court nevertheless determined that equitable tolling for her civil claims was appropriate because "patients receiving such treatment are not aware, because they are never told or put on any notice, that the clinics they attend are government-funded or that doctors treating them are government employees." *Id.* at 183. *Valdez* reflects the common-sense, equitable notion that in certain cases, a plaintiff simply does not have the requisite knowledge of their claims in the statutory period.

It is therefore unsurprising that there exists a robust body of caselaw applying equitable tolling to discriminatory mortgage lending schemes, which are difficult for individual borrowers to detect. *See M & T Mortg. Corp. v. White*, 736

---

[5] This Court's precedent thus plainly refutes Emigrant's assertion that Plaintiffs *must* offer evidence of affirmative concealment. (Appellants' Br. at 33). Emigrant relies on *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988), a fraudulent concealment case, even though this Court has held that "the doctrine of equitable tolling is not limited to such cases." *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182–83 (2d Cir. 2008).

F. Supp. 2d 538, 555–57 (E.D.N.Y. 2010); *Barkley v. Olympia Mortg. Co.*, No. 04-CV-875, 2007 WL 2437810, at *16–17 (E.D.N.Y. Aug. 22, 2007); *Council v. Better Homes Depot, Inc.*, No. 04-CV-5620, 2006 WL 2376381, at *9 (E.D.N.Y. Aug. 16, 2006); *Phillips v. Better Homes Depot, Inc.*, No. 02-CV-1168, 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003).[6] In each of these cases, the courts recognized that lending discrimination claims in particular are hidden from consumers. *White*, 736 F. Supp. 2d at 556; *Council*, 2006 WL 2376381, at *9; *Phillips*, 2003 WL 25867736, at *25; *Jones v. Ford Motor Credit Co.*, No. 00-CIV-8330, 2002 WL 88431, at *5 (S.D.N.Y. Jan. 22, 2002) (all explaining that a plaintiff may reasonably not know she has been a victim of discrimination until meeting other victims or learning more about lending practices in minority communities, such as by meeting with counsel). As the court noted in *Philips*, "[t]here is a difference between being aware that you got a bad deal and being aware that you were discriminated against in a systematic fashion." 2003 WL 25867736 at *25.

Plaintiffs here did not know that they had claims for race discrimination when they closed on their Emigrant loans, or even when Emigrant imposed the default interest rate. The Saint-Jeans first began to suspect discrimination in May

---

[6] Emigrant's attempt to distinguish this line of cases is premised on ignoring the evidence of concealment and is therefore unpersuasive. (*Compare* Appellants' Br. at 38, *with infra* Section II.A.2).

2011, while observing other Emigrant borrowers in foreclosure court, whom they noticed were people of color. (Tr. at 1382, 1451–53, 1497–99).[7] The Saintils learned of Emigrant's discrimination in 2011 when meeting counsel. (*Id.* at 669, 783, 793, 1808, 1824–27). Mr. Howell, Beverley Small, and Jeanette Small all learned of Emigrant's discrimination in 2013, also when they met with counsel. (Tr. at 253, 1097–99, and 1313). As both Jeanette Small and Ms. Commodore noted at trial, prior to that point, they did not know other borrowers' loan terms and race, nor did they know about Emigrant's advertising practices. (*Id.* at 1313, 1710).

None of the Plaintiffs knew other Emigrant borrowers nor their salient commonality—race[8]—and thus had no notice of potential discrimination. (*Id.)* An individual borrower could not undertake statistical analyses of Emigrant's STAR NINA loans to understand their disproportionate effect in minority neighborhoods. Moreover, Emigrant's targeting of minorities would not have been evident to an individual consumer, who would not have had access to the full suite of Emigrant's marketing materials and expenditures. If Plaintiffs had filed a discrimination case

---

[7] Emigrant argues that equitable tolling cannot apply to the Saint-Jeans because they became aware of Emigrant's discrimination by March 2009, more than two years before they filed suit. (Appellants' Br. at 40 n.25). But the record confirms that the Saint-Jeans' first appearance in foreclosure court was in May 2009, making timely their April 2011 federal claims. (*See, e.g.*, Ex. P-510; Tr. at 1382, 1451–53).

[8] As Emigrant acknowledges, discrimination claims have a comparative element to them, *see infra* Section III.B, rendering the race of other borrowers critical to understanding the nature of the wrong.

based on only what was known to them at closing—*i.e.*, without allegations regarding the race of STAR NINA borrowers, the geographic distribution of STAR NINA loans, or Emigrant's advertising practices—they would not have survived a motion to dismiss the claims they now bring. Applying the logic of this Court's precedent, these circumstances merit equitable tolling. *Valdez*, 518 F.3d at 182–83; *see also Veltri*, 393 F.3d at 323–34 (considering whether a reasonable person would "not otherwise be aware of their claim" and tolling statute accordingly).

Emigrant's authority does not change this analysis. Emigrant cites both *Clark v. Chase Bank US, N.A.*, 643 F. App'x 838, 840–41 (11th Cir. 2016), which did not involve discrimination claims, and *Jordan v. Chase Manhattan Bank*, No. 13 CIV. 9015, 2014 WL 3767010, at *9 (S.D.N.Y. July 31, 2014), which was a motion to dismiss decision where the pro se plaintiff failed to allege when she learned of her claims and why she was prevented of learning of them during the statutory period. Moreover, the plaintiffs in those cases provided *no facts* indicating that the key elements were concealed, whereas here there is substantial record evidence to the contrary. (*See infra* Section II.A.2). Emigrant's citation to *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 291 (S.D.N.Y. 2011), is also of limited utility. In *Grimes*, the district court refused to apply equitable tolling because the plaintiff did not specifically plead fraudulent concealment, precisely what *Veltri* and *Valdez* hold is not required.

### 2. *The Propriety of Tolling Is Confirmed by Emigrant's Concealment*

Emigrant states that "Plaintiffs failed to provide any evidence that Emigrant engaged in affirmative concealment." (Appellants' Br. at 34). The trial record resoundingly refutes this assertion.[9] Although evidence of concealment is not necessary to warrant tolling (*see supra* Section II.A.1), in the context of an equitable analysis, it supports extending a statute of limitations. Delayed pursuit of a cause of action is all the more reasonable when a defendant has concealed it, whether fraudulently or not. For example, in *Veltri* this Court determined that although a pension fund distributed a booklet to notify participants of their rights, the contents did not conform to the applicable regulation, and a participant subsequently filed an untimely action. 393 F.3d at 323–24. Though not fraudulent, the fund's disclosures concealed the participants' rights, which prevented a timely claim. *Id.*

Many courts in this Circuit have determined that equitable tolling applies when a lender engages in concealment at and after closing. For example, courts have applied tolling when borrowers have not been able to read closing documents or are "essentially rebuffed" when trying to learn more about their loans. *Phillips*,

---

[9] Perhaps to distract from an unfavorable record, Emigrant cites only to summary judgment briefing for its arguments about concealment, ignoring entirely the evidence presented at trial.

2003 WL 25867736 at *16, *25. And multiple courts have determined that misleading a borrower about legal representation at closing supports extending the statute of limitations. *White*, 736 F. Supp. 2d at 559 (explaining risks of a lawyer with divided loyalties); *Barkley*, 2007 WL 2437810 at *17 ("The act of employing ostensibly independent legal counsel as part of a predatory lending scam has been held to satisfy the concealment element . . . ."); *Council*, 2006 WL 2376381 at *1 (attorney working for defendants falsely stated he represented the plaintiffs).

Here, too, the evidence of concealment confirms that the district court did not abuse its discretion in determining that the equities weigh in favor of tolling Plaintiffs' claims. This concealment evidence includes Emigrant's process for managing closings, misrepresentations about the lawyers present, and hidden and conflicting loan terms.

The closing process was designed to *prevent* borrowers from understanding the terms of their loans: multiple Plaintiffs' requests to read documents were rejected. (*See, e.g.*, Tr. at 1078–88 (B. Small); 234–38 (F. Howell)). Each Plaintiff also testified at trial that their Emigrant closing was a rushed process in which they were pressured to quickly initial and sign a large stack of documents without being given time to review them. (*Id.* at 234–38, 273–74 (F. Howell); 641–44 (F. Saintil); 1076–88 (B. Small); 1307–09 (J. Small); 1367–68, 1370, 1373, 1375 (E. Saint-Jean); 1477–78, 1488–89, (J. Saint-Jean); 1693–96 (L. Commodore); 1762,

1767–69 (Y. Saintil)). None of the Plaintiffs understood the terms of their loans or had those terms explained to them either before or during the closing. (*Id.*) Plaintiffs' confusion is understandable given that Emigrant admitted at trial that it made no effort to confirm that its brokers were explaining the loan terms. (*Id.* at 1653, 1657–58).[10]

Plaintiffs also testified they believed an attorney would be provided for them, and Plaintiffs paid for the attorneys present as part of the closing fees, but documents revealed that the attorneys present at closing actually represented Emigrant. (*See, e.g.*, Tr. at 641–43 (F. Saintil); 1482–84, 1591–92 (J. Saint-Jean); Ex. P-215C at EMC 365318–22; Y-27).

Unsurprisingly, not one Plaintiff understood that their loan carried an 18% default interest rate. (Tr. at 239 (Howell), 647–48 (F. Saintil), 1094 (B. Small), 1308 (J. Small), 1374 (E. Saint-Jean), 1486 (J. Saint-Jean), 1695 (L. Commodore), 1771 (Y. Saintil); *see also* Def. A47 (Emigrant files reflecting a phone call from Mr. Saintil stating that he was not aware of the default interest rate and no one explained it to him)). To find the default interest rate, a borrower would have had

---

[10] Far from explaining terms, the trial record included evidence that Emigrant knew that a full understanding of STAR NINA might scare away prospective borrowers: CEO Milstein approved closing Emigrant's Illinois office in response to a new law requiring borrowers with credit scores under 620 to receive financial counseling. (Ex. P-88 (email from Emigrant Vice Chairman James Woolsey noting that "[i]t is likely that," in counseling, "many of our nodoc STAR borrowers will be told they can't afford a loan with us.")).

to carefully read through hundreds of pages to find the rider, and even then, the borrower would have to parse contradictory rates across multiple documents. (Ex. P-593 (list of closing documents); Tr. at 1081–82 (B. Small); Ex. P-118 at EMC2_368794 (regulatory report noting conflicting information about the cost of Emigrant loans in its disclosures)).

To the extent that Emigrant contends that STAR NINA terms were adequately disclosed to borrowers, either at closing or in advance, Emigrant's own regulator issued a report recognizing the hidden nature of the loan terms:

> [t]he default interest rate was not disclosed in the underlying mortgage note but only in the rider . . . Moreover, more than a third of the loan files reviewed indicated that borrowers did not ever receive the commitment until closing. Furthermore, there is no evidence in the filed reviewed by the Department that brokers from whom EMC received applications for these products disclosed the 18% default interest rate to the borrower at the time of the application or thereafter. Also the commitment and mortgage notes . . . provide for an interest cap that was always significantly lower than 18% and thus in direct conflict with the default interest rate of the 18% in the riders.

(Ex. P-118 at EMC2_368794; *see also* Tr. 333–35; 437–40 (Dr. Ayres explaining the shrouded and deceptive nature of the loans)). At trial, Ed Goldberg, Emigrant's Chief Underwriter, was unable to identify where in the closing packet the default interest rider was located. (Tr. at 840). And although Emigrant makes much of the "resource letters," (*see* Appellants' Br. at 8–9), even a broker that Emigrant called to testify admitted that he did not recognize the "resource letter," and did not know what the document was or what information it contained, (Tr. 2441–44). If

Emigrant's state regulator, chief underwriter, and broker all found the loan terms to be hidden, certainly a "reasonable plaintiff in the circumstances" would as well, especially when viewing the evidence in the light most favorable to Appellees. *Veltri*, 393 F.3d at 323.

Though evidence of fraud is also not required, *see Valdez*, 518 F.3d at 182–83, the evidence of falsified signatures and misrepresentations further tips the equitable scale in Plaintiffs' favor. Plaintiffs presented evidence at trial that for at least three of the loans at issue there were forged signatures on pre-closing disclosures that Emigrant kept on file. (*See* Tr. at 642–48, 738 (F. Saintil); 1762–66, 1767–68 (Y. Saintil); 1367–79, 1418, 1422–23, 1465–66 (E. Saint-Jean); 1478–93, 1530–32, 1591–92 (J. Saint-Jean); 1686–93, 1694–96 (L. Commodore); Ex. B15, Ex. C16 (Saintil signature fraud), Ex. K28, Ex. W29 (Saint-Jean signature fraud), Ex. G5 (Commodore signature fraud); Tr. 2984–85 (closing argument explaining documents)). The Saint-Jeans also explained how they had been promised a 9% interest rate prior to closing and tried to leave the closing when they discovered the initial rate would be 11%, but then were induced to stay on the false promise, made in front of Emigrant representatives, that their rate would be reduced following six months of timely payments. (Tr. at 1370, 1485–88).

Emigrant argues that any concealment at closing was perpetrated by brokers, whom it paints as free agents. (*See* Appellants' Br. at 33–34.) Not so—the

concealment at issue is directly attributable to Emigrant. It was Emigrant, not brokers, who drafted the voluminous loan paperwork. (*See, e.g.*, Ex. P-118 at EMC2_368794). It was Emigrant, not brokers, that set the conflicting terms and relegated the default interest rate to a separate rider. (*Id.*) And it was Emigrant that dictated brokers' conduct through its Broker Direct Sourcebook, "which was provided to all brokers, and included all of [its] policies and procedures that they were required to comply with," (Tr. at 2204; Ex. K-50), as well as through its Broker Direct Account Managers, who were Emigrant employees, (Tr. at 915–16, 950).[11] And concealment aside, it was Emigrant that discriminated against Appellees and their communities by targeting them for these loans.

In sum, although the nature of Emigrant's systemic discrimination explains why Plaintiffs were prevented from filing discrimination claims in the statutory period, Emigrant also engaged in concealment, which favors tolling Plaintiffs' claims. On this record, the district court did not abuse its discretion by finding that the equities favor Plaintiffs.

---

[11] Even if any of the fraudulent conduct were attributable to brokers instead of Emigrant, the FHA imposes liability "in accordance with traditional agency principles." *Meyer v. Holley*, 537 U.S. 280, 282 (2003). Under those principles, a principal may be liable for the wrongdoing of an independent contractor. *See Aguirre v. Turner Constr. Co.*, 582 F.3d 808, 810 (7th Cir. 2009); Restatement (Third) of Agency § 1.01 cmt. c (2006). At summary judgment, Plaintiffs provided ample authority that Emigrant could also face liability for its brokers' conduct through the separate theories of apparent authority and negligent supervision. (Dkt. 364 at 32–34).

### 3. *Plaintiffs Acted Diligently upon Learning of Their Causes of Action*

All eight Plaintiffs diligently pursued their claims upon learning of Emigrant's discriminatory conduct, and Emigrant has not established that the district court abused its discretion in reaching this conclusion. The diligence prong of the equitable tolling analysis asks whether a plaintiff "exercise[ed] that level of diligence which could reasonably be expected in the circumstances." *Veltri*, 393 F.3d at 322. In the context of mortgage actions, courts have specifically noted that diligence is evaluated not from an "indication of an unfavorable agreement" but instead from "an indication of wrongdoing affecting the validity of the mortgage or Defendants' liability." *Council*, 2006 WL 2376381, at *10. Here, the record shows that Plaintiffs timely filed their claims after receiving an indication of the wrongdoing at issue here—discrimination.

The Saint-Jeans initiated this action in April 2011, within two years of first observing Emigrant borrowers in court and suspecting discrimination.[12] (*Compare* Dkt. 1 (Complaint), *with* Tr. at 1386 (E. Saint-Jean, first learned of discrimination in foreclosure proceedings), *and id.* at 1497–98 (J. Saint-Jean, same)). The Saintils joined the case in May 2012 after learning about Emigrant's discrimination in

---

[12] The statute of limitations to file a claim in court is three years under the NYCHRL and two years under the federal statutes. *See* N.Y.C. Admin. Code § 8-502(d); 42 U.S.C. § 3613 (FHA); 15 U.S.C. 1691e(f) (ECOA).

2011. (*Compare* Dkt. 42-1 (First Amended Complaint), *with* Tr. at 671–72 (F. Saintil learned of discrimination in 2012), *and id.* at 1807–08 (Y. Saintil, same)). The remaining Plaintiffs learned of Emigrant's discrimination in 2013 and joined the case in 2014. (*Compare* Dkt. 264 (Second Amended Complaint), *with* Tr. at 310–11 (F. Howell learned of discrimination in 2013), *id.* at 1097–99 (B. Small, same), *id.* at 1313 (J. Small, same); *and id.* at 1709–10 (L. Commodore, same)). Emigrant cites no evidence to undermine this diligence.

Rather than acknowledging their diligence after learning of discrimination, Emigrant instead focuses on when the predatory terms of Plaintiffs' loans were triggered. This approach is, yet again, grounded in a mischaracterization of the claims at issue, which are not that Plaintiffs got bad loans, but that they were being "discriminated against in a systemic fashion." *Barkley*, 2007 WL 2437810 at *17 (quotation marks omitted). Just as in *Barkley*, even if Plaintiffs knew their loans were expensive, without meeting other Emigrant borrowers or consulting with an attorney, they "had no way of knowing exactly how and why they had been victimized." *Id*. Courts in this Circuit have explicitly held that there is no lack of diligence where individuals cannot readily discern the systemic disparities that give rise to their cause of action. *Kassman*, 2015 WL 5178400, at *5–6. Here, too, Plaintiffs could not have known that they had claims for discrimination until they obtained information about other Emigrant borrowers. For the Saint-Jeans this

occurred in foreclosure court, and for the remaining Plaintiffs when they met with their lawyers.

With no way to prove an abuse of discretion, Emigrant makes the alarmist argument that to apply equitable tolling here would entirely eliminate statutes of limitations for mortgage discrimination claims. (Appellants' Br. at 4, 40–41). But this is not true: equitable tolling is a fact-specific analysis that depends on when a plaintiff learned of the particular wrong at issue. Courts have thus rejected its application when a plaintiff had knowledge about other similarly situated borrowers. *See Clement v. United Homes, LLC*, No. 10-CV-2122, 2014 WL 3014695, at *4 (E.D.N.Y. July 3, 2014). Moreover, the very case that Emigrant cites for its slippery slope argument provides the answer: a defendant can invoke the defense of laches or equitable estoppel. *Veltri*, 393 F.3d at 326. Emigrant has neither asserted nor proven either defense. And of course, a plaintiff who unreasonably fails to discern her claims also cannot benefit from the doctrine. *Id.* at 323.

Affirming the district court would therefore do no more than confirm that it was not an abuse of discretion to apply equitable tolling based on the record evidence that *these* Plaintiffs were prevented from learning of Emigrant's discrimination during the statutory period.

### B. The District Court Properly Applied the Discovery Rule

The discovery rule provides an independent basis for deeming Plaintiffs'
claims timely. The discovery rule provides that "any plaintiff who is blamelessly
ignorant of the existence or cause of his injury should be accorded the benefits of
the more liberal accrual standard." *Barrett v. United States*, 689 F.2d 324, 327 (2d
Cir. 1982).[13] Courts in this Circuit delay accrual under the discovery rule until a
plaintiff can discern "enough of the critical facts of injury and causation to protect
himself by seeking legal advice." *Kronisch*, 150 F.3d 121 (citation omitted); *see
also Valdez*, 518 F.3d at 177.

Application of the discovery rule turns on both what injury is claimed and
when "the critical facts relating to the cause" are discovered. *Barrett*, 689 at 328.
Discrimination constitutes an actionable injury in and of itself. *See Congregation
Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 945 F.3d 83, 110 (2d Cir.
2019). For that reason, prevailing civil rights plaintiffs are entitled to nominal
damages even in the absence of compensable harm. *LeBlanc-Sternberg v. Fletcher*,
67 F.3d 412, 431 (2d Cir. 1995). Plaintiffs here did not know of the actionable
injury animating their claims until they knew about Emigrant's discrimination. The
district court thus correctly held that the Plaintiffs' claims began to accrue when

---

[13] Here, too, a reasonableness requirement serves as a check on Emigrant's
assertion that the discovery rule would extend the limitations period indefinitely.
*Valdez*, 518 F.3d at 177.

they "understood they were victims of a discriminatory lending scheme." (Dkt. 258 at 29).

This is consistent with other systemic lending discrimination cases, which, as noted above, have found that, "a victim may not know he or she has been the target of discrimination until meeting other victims or learning more about lending practices in minority communities." *Phillips*, 2003 WL 25867736, at *25; *see also Jones*, 2002 WL 88431, at *5 (statute of limitations began to run in ECOA case when plaintiff met with his attorneys and became aware of the alleged discrimination); *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 42, 52–53 (S.D.N.Y. 2001) (permitting plaintiffs in case filed in 2000 to show they did not know they were targeted for discriminatory insurance policies issued to African Americans from late 1800s through the 1970s). Plaintiffs each had two years from when they learned of Emigrant's discrimination, and all eight of them filed discrimination claims within that window.

Emigrant argues that accrual commenced when it "imposed a higher default interest rate" on Plaintiffs, allegedly because "that forms the core of Plaintiffs' case." (Appellants' Br. at 30–31). But again, this position fundamentally misunderstands Plaintiffs' claims. Plaintiffs are not suing Emigrant because it imposed an 18% interest rate on them; they are suing Emigrant because it discriminated against them.

Emigrant cites to both *Rotella v. Wood*, 528 U.S. 549, 555 (2000), and

*Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 371–72 (E.D.N.Y. 2012), for

the proposition that the statute of limitations runs upon the discovery of some

harm, even if the precise cause remains unknown. But *Rotella's* holding is that the

discovery rule does not apply to a plaintiff who knows both her injury and its cause

and merely does not know the particular legal right that has been violated. *Rotella*

thus made clear that it was distinguishing between a plaintiff's "ignorance of his

legal rights" (where the discovery rule does not apply) and "his ignorance of the

fact of his injury or its cause" (where the discovery rule does apply). 528 U.S. at

555–56 (citation omitted). Here, Plaintiffs were not aware of the fact of their

injuries, discrimination, or the cause, Emigrant's scheme to target predatory loans

at minority communities, until meeting with counsel.

   *Clement* similarly explains that the discovery rule stops a claim from

accruing until there has been "[d]iscovery of the 'critical facts' of injury and

causation." 914 F. Supp. 2d at 372 (citation omitted). *Clement* differs from this

case because the plaintiff there knew within months that there were defects in the

house at issue and that neighbors were having comparable issues, whereas here the

Plaintiffs knew nothing about other borrowers or Emigrant's discrimination. (*See*

*supra* p. 16–17; *see also* Dkt. 258 at 29). Also inapposite is *Clement*'s reliance on

an employment discrimination case that included a discrete adverse action—

termination—and thus does not extend to situations where aggregate data is necessary to discern discrimination.[14] 914 F. Supp. 2d at 372; *see also Andrews v. Freemantlemedia N.A., Inc.*, No. 13 CIV. 5174, 2014 WL 6686590, at *6 n.1 (S.D.N.Y. Nov. 20, 2014), (contrasting accrual standards for predatory lending and employment claims), *aff'd*, 613 F. App'x 67 (2d Cir. 2015). Accordingly, neither *Rotella* nor *Clement* disturb *Kronisch*'s governing pronouncement that the discovery delays accrual "until a plaintiff is able to discern enough of the critical facts of injury and causation to protect himself by seeking legal advice." 150 F.3d at 121 (citation omitted).

The record is clear that Appellees all filed their claims within two years of discovering that they were victims of a discriminatory lending scheme. This Court should affirm the district court's decision to deem Plaintiffs' claims timely.

## III.   **The District Court Correctly Charged the Jury on Disparate Impact**

Emigrant's challenges to the disparate impact instruction are without merit. Because it failed to timely raise certain objections, Emigrant must show

---

[14] Discovery is also far more likely in employment situations, where coworkers know each other and because comparators are readily apparent through public hires or promotions. Yet even in the employment context, courts have recognized the potential for hidden discrimination. *See Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49 (2d Cir. 1985) (noting that equitable tolling appropriate where the plaintiff can show "that it would have been impossible for a reasonably prudent person to learn that an employment decision was discriminatory" (citation omitted) (quotation marks omitted) (alteration adopted)).

fundamental error, which it cannot do on this record. Far from fundamental error, controlling precedent instead confirms that the district court correctly charged the jury on disparate impact. The instruction properly applied the governing three-part standard, quoting directly from binding Second Circuit authority and the appliable regulation from the Department of Housing and Urban Development (HUD). And because Plaintiffs' evidentiary showing plainly satisfied this standard, Emigrant cannot demonstrate prejudice even for those objections it did preserve.

### A. Emigrant Has Not—and Cannot—Demonstrate Fundamental Error

Emigrant argues that the disparate impact instruction is flawed because one specific sentence did not include the word "disproportionate" and because of how it articulated causation. (Appellants' Br. at 43–45, 47–49.) But Emigrant did not preserve these objections, and therefore must prove a fundamental error, an impossibility on this record.

To preserve an objection to a jury instruction, a party must timely "stat[e] distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51(c). Broad objections will not suffice—an objection must be stated with sufficient specificity as to permit correction. *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 113–15 (2d Cir. 2002). Where "the party fails to object to the instruction before the jury begins deliberations, a subsequent challenge based on that charge should be entertained only if the alleged errors are 'fundamental.'"

*Shade*, 251 F.3d at 312. A fundamental error is one "so serious and flagrant that it goes to the very integrity of the trial." *Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 79 (2d Cir. 1995) (citation omitted) (quotation marks omitted). The charge cannot be disturbed unless it "deprived the jury of adequate legal guidance to reach a rational decision." *Id.* (citation omitted) (quotation marks omitted).

Emigrant did not timely lodge—and therefore waived—two of the objections on which it now bases its appeal. Emigrant did not object at any point, in its written objections, during the charge conference, or after the jury instructions were read, that the instruction should have addressed "robust causation" or a disparity "over and above" some baseline, as it now argues. (Dkt. 504; Tr. at 2741–50, 3109–11). The same is true for Emigrant's argument about the word "disproportionate." Both parties included "disproportionate" in their proposed disparate impact instructions, and thus neither side raised it at the charge conference. (Tr. at 2741–50). Rather, Emigrant focused on a separate request to add language about the impact on minorities "as compared to whites." (*Id.* at 2744). The district court distributed the final charge, without the word "disproportionate," before it was read to jury. (*Id.* at 3062–63). Emigrant did not object as to this omission at that time or when the district court had a sidebar with counsel to invite objections and corrections directly after charging the jury. (*Id.* at

3109–10). By contrast, counsel for Plaintiffs suggested a correction to the disparate impact instruction during the sidebar, the instruction now at issue, and the district court recharged the jury. (*Id.*).[15]

Emigrant accordingly waived these causation arguments by failing to timely object on these grounds.[16] These objections cannot sustain reversal unless Emigrant demonstrates that the instruction given undermined the very integrity of the trial and deprived the jury of adequate guidance to make a rational decision. *Travelers Indem. Co*, 62 F.3d at 79. Emigrant has not even mentioned this rigorous standard and certainly has not met it. Emigrant's failure to address the fundamental error standard in its opening brief prevents it from now prevailing on unpreserved objections. *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief."). In any event, as explained below, the disparate impact instruction was correct as given, and therefore cannot somehow be construed as a fundamental error.

---

[15] The district court's post-charge sidebar overcomes any argument that Emigrant was deprived of the chance to raise its "disproportionate" objection before deliberation, especially because the charge was distributed to counsel in advance.
[16] Emigrant raised other arguments as to causation, but not those it now pursues. Under this Court's precedent, each objection must be specifically lodged to be preserved. *Medforms, Inc.*, 290 F.3d at 113–14 (finding objections waived where similar yet separate issues were raised at the charge conference).

## B. The District Impact Instruction Properly Applied the Governing Framework

Whether preserved or not, Emigrant's challenges to the disparate impact instruction fail because the charge correctly articulated and applied the governing standard. Disparate impact claims are governed by a three-part burden-shifting framework. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 527 (2015); *see also* 24 C.F.R. § 100.500. First, a plaintiff can establish a prime facie case by showing that a defendant's policy or practice has a disparate impact on a protected class. *Id.* Second, the defendant may establish that the policy or practice serves a substantial, legitimate, nondiscriminatory interest. *Id.* Third, if the defendant meets its burden at the second phase, the plaintiff may still prevail by establishing that the defendant's interests could be served by a less discriminatory alternative. *Id.* The district court's jury charge enumerated this framework, properly describing and allocating the burden at each stage. Emigrant attempts to mount three challenges to this instruction. None has merit.

### 1. *The Jury Charge Captured the Comparative Aspect of a Disparate Impact Claim*

Emigrant argues that the district court "fundamentally changed the required elements of Plaintiffs' claim" because it "omitt[ed] any reference to evidence of a comparative impact." (Appellants' Br. at 45). This position is reached only by ignoring key precedent and focusing on a single sentence to the exclusion of the

rest of disparate impact instruction and the jury charge more generally. (*Id.* at 43–45). But the sentence at issue accurately states the standard, and when evaluated in context, the charge plainly captures the comparative nature of a disparate impact claim.

The district court instructed the jury that "Plaintiffs must establish by a preponderance of the evidence that Defendants' practice of making STAR NINA loans actually or predictably *had a substantial adverse impact* on African American [and Hispanic] borrowers." (Tr. at 3096 (emphasis supplied)). This language comes directly from this Court's foundational case on disparate impact, *Huntington Branch, NAACP v. Town of Huntington*, which found a municipality liable for a zoning decision that "*had a substantial adverse impact* on minorities." 844 F.2d 926, 937 (2nd Cir. 1988) (emphasis supplied).[17] By using the language from this Court's primary disparate impact case, the district court properly set forth the prima facie burden.

Emigrant's contention that this sentence is flawed because it does not include the word "disproportionate" is wrong as a matter of logic and law. The district court specifically described this claim as a "discriminatory effect" claim.

---

[17] Although steps two and three of the disparate impact framework have been updated in the years since *Huntington Branch*, its description of a plaintiff's initial burden remains intact, and the Supreme Court described the case as "resid[ing] at the heartland of disparate-impact liability." *Inclusive Cmtys.*, 576 U.S. at 539.

(Tr. at 3095–96 (Plaintiffs "can also prove that a particular practice had a discriminatory effect, even if the practice was not motivated by discriminatory intent."); *Id.* at 3096 ("Plaintiffs are alleging that Defendants' practice of making STAR NINA loans has a discriminatory effect.")). This language is inherently comparative—whether a policy or practice has a discriminatory effect necessarily evaluates whether it weighs more heavily on one group than another. It is therefore unsurprising that, at the charge conference, counsel for Emigrant *agreed* that using "discriminatory effect" instead of their initial proposed language "may be another way" to capture the comparative aspect of this claim. (Tr. at 2746). HUD, too, relies on the phrase "discriminatory effect" to describe this type of liability. *See generally* 24 C.F.R. § 100.500 ("Discriminatory effect prohibited"). The charge also asked the jury to assess the impact *on minority communities*, not just in the abstract. By focusing on the impact on minority communities, the sentence invites comparison to nonminority communities.

Emigrant neglects to mention that the very word on which it focuses is included elsewhere in the jury charge. The district court explained to the jury that "the Plaintiffs . . . claim that the Defendants . . . violated their rights . . . by allegedly making [STAR NINA] loans *disproportionately* in African American and Hispanic communities." (Tr. at 3072–73 (emphasis supplied); *see also* Tr. at 3073 ("Defendants also deny that the STAR NINA loan product *disproportiona[te]ly*

impacted African Americans and Hispanic borrowers." (emphasis supplied))).

Because this Court "look[s] to the charge as a whole," *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002), there can be no error of omission when the exact word was, in fact, included. And the evidence presented throughout "the proceedings that were observed by the jury," *Chalmers v. Mitchell*, 73 F.3d 1262, 1267 (2d Cir. 1996), confirmed the disproportionate harm that Emigrant inflicted in minority communities. This evidence included expert testimony and internal emails showing that Emigrant disproportionately wrote STAR NINA loans in minority communities. (Tr. at 353–54, 1834, 2816, 2960–61; Ex. P-262).

Not one of Emigrant's citations supports a different outcome. For example, the instruction here is consistent with *MHANY Mgmt., Inc. v. Cnty. of Nassau*, even if it used a slightly different formulation. 819 F.3d 581, 617 (2d Cir. 2016) (describing showing of "a significantly adverse *or* disproportionate impact on persons of a particular type" (emphasis supplied)). "A trial court has discretion in the style and wording of jury instructions," so long as the instructions "adequately inform the jury of the law." *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 389 (2d Cir. 2020) (quotation marks omitted). Emigrant's invocation of *Tsombanidis v. West Haven Fire Dep't* is from the portion of the opinion describing what type of evidence could suffice for a plaintiff's prima facie case, but the Court described the

overall burden using language comparable to that used here. 352 F.3d 565, 575–76 (2d Cir. 2003) (a plaintiff must show "a significantly adverse *or* disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices" (emphasis supplied)). And *Perricone-Bernovich v. Tohill*, an unpublished decision at the motion to dismiss stage, could not sustain reversal. 843 F. App'x 419 (2d Cir. 2021). There, the pro se plaintiff failed to either include any allegations about "the effect of the Defendants' policies on people with disabilities as a group or compare that effect to the effect on the broader population," both of which are accomplished in the jury instruction here. *Id.* at 421.

The disparate impact instruction properly captured Appellees' burden to show that Emigrant's practice of making STAR NINA loans visited disproportionate harm on minority communities as compared to nonminority communities, and Emigrant has failed to identify any error in the instruction's expression of this discriminatory effect.

### 2. *The Jury Charge Correctly Captured Causation*

Again focusing on the same sentence, Emigrant argues that the disparate impact instruction did not adequately convey the causal relationship between STAR NINA loans and the adverse impact on minority communities. (Appellants' Br. at 47–49). But the causal link is apparent on the face of the instruction, which directed the jury to determine whether Appellees established that STAR NINA

loans "*had* an adverse impact" on minority communities. In this context, "had" is synonymous with "caused"—indeed, it could not mean anything else. (No one could plausibly understand that sentence to mean that the practice "correlated with" an adverse impact.)

Emigrant asserts that the district court was required to mention both "robust causality" and an impact "over and above" external disparities. Setting aside that Emigrant waived these arguments, (*see Supra* Section III.A), Emigrant is wrong on both fronts. The requirement to identify a policy and a resulting adverse effect inherently captures a causal link. As HUD explained when promulgating the relevant regulation, "[w]hat *Inclusive Communities* requires is that a court's examination of causality be robust. Both the 2013 Rule and this final rule incorporate this requirement by requiring a plaintiff to link a specific practice to a current or predictable disparity." Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450, 19461 (Mar. 31, 2023) ("HUD Reinstatement"). Notably, Emigrant cites no examples of jury instructions that mentioned "robust causality," which is also entirely absent from this Court's key post-*Inclusive Communities* decision, *MHANY*.

The notion that the disparity must reach a certain order of magnitude above other disparities is also at odds with binding precedent. For example, *Inclusive Communities* expressly relies on *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971),

where the Supreme Court found an unlawful disparate impact from an employer's policy requiring high school diplomas even though the employer did not create the underlying disparity in high school diploma rates among African Americans. Similarly, in *MHANY*, this court affirmed the district court's finding of a discriminatory effect even though it flowed from underlying socioeconomic disparities across races, which the defendant did not create. 819 F.3d at 597; *see also Huntington Branch*, 844 F.2d at 937–38 (disparate impact on minorities because they had lower incomes and therefore were more likely eligible for the housing precluded by the challenged zoning practices).[18] These decisions, like the charge here, reflect that by requiring causation and not mere correlation, the disparate impact standard "ensures that, as required by *Inclusive Communities*, defendants are not held liable for racial disparities they did not create." HUD Reinstatement, 88 Fed. Reg. at 19461.

### 3. *The Jury Charge Properly Articulated the Less Discriminatory Alternative Standard*

Emigrant claims that by failing to use the word "available" in the step three instruction regarding less discriminatory alternatives, the district court lessened Plaintiffs' burden and permitted them to prevail with options that "were utterly

---

[18] Emigrant's citation to *Boyd v. Lefrak Org.*, 509 F.2d 1110, 1113 (2d Cir. 1975), for this proposition is revealing. *Boyd*, which rejected disparate impact as a viable claim under the FHA, was long ago overturned by *Huntington*, 844 F.2d at 934.

impractical or purely theoretical." (Appellants' Br. at 46–47). Setting aside that even Emigrant's proposed charge did not have the word "available," (Dkt. 484 at 9), this argument is plainly contradicted by the charge's requirement that Appellees *establish* that Emigrant's interests *could have been served* by alternatives. (Tr. at 3096). Because the charge required this showing, Appellees could not have prevailed with unsupported hypothetical options.[19]

This instruction also tracks the applicable HUD regulation nearly word for word. (*Compare* Tr. at 3096–97 (asking jury whether Appellees established that Emigrant's interests "could have been served by another practice that had a less discriminatory effect"), *with* 24 C.F.R. § 100.500(c)(3) (a plaintiff may prevail by proving that the interests "could be served by another practice that has a less discriminatory effect")). And the case on which Emigrant relies, *MHANY*, expressly remanded for consideration of whether plaintiff met its burden under HUD's standard, the same language used here, not for consideration of whether plaintiff had shown an "available" alternative. 819 F.3d at 620; *see also id.* at 618 (explaining that this Court defers to HUD regulations interpreting the FHA).

---

[19] HUD's implementing language, which Emigrant quotes via *CoreLogic*, does nothing more than confirm that a plaintiff must prove the existence of a less discriminatory alternative, as Appellees did here. *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 301 (D. Conn. 2020).

### C. Regardless of Any Error, the Disparate Impact Instruction Did Not Prejudice Emigrant

The district court properly charged the jury on disparate impact, but even if there were some flaw, Emigrant must demonstrate prejudice. This Court will not "disturb[] the district court's judgment" on jury instructions absent an "error [that] was prejudicial in light of the charge as a whole." *Turley*, 774 F.3d at 153 (quotation marks omitted) (rejecting claim of prejudice because other portions of charge addressed the appellant's concern). The Court must evaluate the claim of harm considering not just the entire charge, but also the record evidence. *Weiss v. La Suisse*, 141 F. App'x 31, 33 (2d Cir. 2005) (agreeing that the district court's jury charge wording was wrong but nevertheless affirming based on evidentiary record). Emigrant has not shown harm related to the three errors it perceives in the discriminatory effects instruction and therefore cannot sustain reversal.

*First*, Emigrant cannot show prejudice related to how the discriminatory effects charge captured the comparative nature of the claim.[20] The charge specified an adverse impact on minority communities, repeatedly relied on inherently comparative language, and used the word "disproportionate." When read "as a whole," as is required, these portions of the jury charge made clear to the jury that it was weighing the impact based on race. *See Patrolmen's Benevolent Ass'n*, 310

---

[20] Again, at least some portion of this objection has been waived. *See supra* Section III.A.

F.3d at 55. Moreover, the trial record confirms that evidence of the disproportionate effect was salient throughout the trial. The transcript includes testimony from three experts confirming that the proportion of STAR NINA loans increased as the percentage of minorities in a census tract increased and testimony from Emigrant confirming that minority borrowers had higher priced loans than white borrowers because of STAR NINA loans. (*Supra* p. 6). A strong evidentiary showing, like Plaintiffs' showing here, precludes a finding of prejudice even if this Court finds some wording error. *Weiss*, 141 F. App'x at 33.

Emigrant's argument for prejudice boils down to the mistaken belief that disparate impact liability can be measured with a comparison of the overall number of white borrowers against the overall number of minority borrowers. (Appellants' Br. at 47). This Court overturned the district court in *Huntington Branch* for committing precisely that error. 844 F.2d at 938 (reversing district court for "relying absolute numbers rather than on proportional statistics"). Emigrant cannot manufacture prejudice based on an argument that this Court has squarely rejected. Emigrant is also wrong to focus on how white borrowers fared—by selectively quoting Dr. Ayres—when the proper inquiry is not who avoided delinquency but instead who Emigrant ensnared in the first place. *Cf. Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000) (holding it's "not necessary

that the defendants make loans on more favorable terms to anyone other than the targeted class").

***Second***, Emigrant summarily dismisses Appellees' evidence on less discriminatory alternatives as not "meaningful," and thus assumes that the jury speculated as to alternatives. (Appellants' Br. at 47). But the charge required Plaintiffs to *establish* alternative practices that could have served Emigrant's interests, and the trial record confirms that Appellees elicited evidence *from Emigrant* about less discriminatory alternatives that were, in fact, available. As just one example, Chief Underwriter Goldberg agreed that Emigrant could have removed the default interest rate to improve the STAR NINA loan product and reduce delinquencies. (Tr. at 849). This change would have still enabled Emigrant to meet the "market demand" it purports to have identified, but with less adverse effects. (*See also* Tr. at 847–48 (discussing how to improve the product with minimum credit scores; income verification; and reducing the debt-to-income ratio)). Based on this evidentiary record, even if Emigrant's proposed wording were correct, the error would be harmless. *Weiss*, 141 F. App'x at 33.

Emigrant's position appears to be that if it could not have issued precisely the same loans to precisely the same borrowers, its interests would not have been served. This position must fail—the "less discriminatory alternative" analysis necessarily looks at whether there are *different* routes to

achieving the same general goals without as much harm. HUD

Reinstatement, 88 Fed. Reg. at 19490–91 (rejecting suggestions to edit the

regulation to specify that alternative practices must be "equally effective").

     ***Third***, Emigrant has not demonstrated harm related to how the jury

charge captured causation.[21] Emigrant contends that because the charge did

not include the desired "over and above" language, it "masked" that "it was

a borrower's credit score, not the racial composition of his or her

neighborhood, that was the driving factor for whether they received a STAR

NINA loan." (Appellants' Br. at 49). Yet in so doing, Emigrant

mischaracterizes testimony from Plaintiffs' expert, who ran a regression

analysis that controlled for credit score and *still* found statistically

significant disparities based on race. (Tr. at 1844–48). The record thus

squarely refutes this contention, precluding any claim of prejudice.

     Because Emigrant has demonstrated neither error nor prejudice in the

disparate impact instruction, it is not cause for reversal.

## IV.   The District Court Properly Instructed the Jury on Disparate Treatment

     The district court's instruction on intentional discrimination was also

correct. The district court properly instructed the jury that animus is not a required

---

[21] And again, on this topic, Emigrant must show not only harm, but fundamental error. *Supra* Section III.A.

element to proving discrimination and that the FHA is violated if race, color, or national origin was one motivating factor behind Emigrant's conduct. (*Id.* at 3094–95). The court's jury instruction on intentional discrimination is consistent with the statutory language and applicable precedent; Emigrant's arguments to the contrary are unavailing.

The FHA makes no mention of animus at all, let alone as a required element. *See* 42 U.S.C. § 3604(b) (making it illegal to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race[.]").[22] In prohibiting discrimination, the FHA does not focus on the personal opinion of the actor, and it certainly does not require that the actor display evidence of animus or hostility.[23] That an FHA violation can be proven by a showing of disparate impact—which does not require any examination into the actor's intent—further

---

[22] The same is true of ECOA and the NYCHRL. *See* 15 U.S.C. § 1691; N.Y.C. Admin. Code § 8-107.

[23] The FHA contemplates punitive damages, and a defendant's state of mind is assessed as part of this inquiry. 42 U.S.C. § 3613(c)(1). Punitive damages are available where (1) "the defendant has engaged in intentional discrimination," and (2) "has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005) (citation omitted) (quotation marks omitted). The separate jury instruction on punitive damages captured this standard. Emigrant's theory would confuse the requirements for an ordinary intentional discrimination claim and the additional showing necessary to sustain punitive damages.

confirms Congress's broad remedial purpose. *See Inclusive Cmtys. Project, Inc.*, 576 U.S. 519.

Courts in this Circuit have consistently held that animus is not a requirement under the FHA. *Boykin v. KeyCorp* held that a plaintiff does "not need to allege discriminatory animus for her disparate treatment claim to be sufficiently pleaded" under the FHA. 521 F.3d 202, 215 (2d Cir. 2008); *see also, e.g.*, *Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 394 (D. Conn. 2009). Under the FHA, "the plaintiff is only required to show that a protected characteristic played a role in the defendant's decision to treat her differently." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (citation omitted). Thus, "discriminatory purpose need not be malicious or invidious." *Id.*; *see also Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) ("Specifically with regard to housing discrimination, a plaintiff need not prove the malice or discriminatory animus of a defendant to make out a case of intentional discrimination"); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1531 (7th Cir. 1990) (holding that treating individuals differently because of race is "actionable discrimination" despite the absence of "racial animus"); *Williams v. Matthews Co.*, 499 F.2d 819, 827 (8th Cir. 1974) (district court erred in ruling "subjective good intentions could overcome the prima facie showing of discrimination"). In *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042 (2d Cir. 1979), this Court cited with approval the holding in *United*

*States v. Pelzer Realty Co.*, 484 F.2d 438, 443 (5th Cir. 1973), that unlawful discrimination exists even when the defendant's "primary goal was to make money, not to violate the Fair Housing Act."

Emigrant tries to ratchet up the standard for intentional discrimination, but the cases it cites do not support its argument. They stand for the unremarkable proposition that a plaintiff *can* show intentional discrimination through proof of animus, not that a plaintiff *must* prove animus to prevail. *MHANY* says this explicitly: "A plaintiff *can* establish a prima facie case of disparate treatment by showing that animus against the protected group was a significant factor in the position taken by the [defendants]." 819 F.3d at 606 (emphasis supplied) (citation omitted) (quotation marks omitted).

Emigrant points to *Francis v. Kings Park Manor*, which mentions in passing that the plaintiff's complaint failed to raise a plausible inference of racial animus, but *Francis* repeatedly describes the proper inquiry as whether the defendant was "motivated by discriminatory intent." *See* 992 F.3d 67, 73 (2d Cir. 2021); *see also id.* at n.21 (same). That the plaintiff did not plead animus was one example of his failure to plead intent. Nor does *Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202 (2d Cir. 2010), help Emigrant. (Appellants' Br. at 50). There, the panel summarily affirmed summary judgment where the record showed "*no* evidence of a discriminatory motive[] and *significant* counter-evidence of *no*

discriminatory motive." *Quad Enters. Co. LLC v. Town of Southold*, No. 05-CV-3776, 2009 WL 10701692, at *7 (E.D.N.Y. July 1, 2009) (emphasis in original).

*MHANY* governs at any rate. It held that "if one of the motivating factors for an act was unlawful, the act violated the FHA." *See* 819 F.3d at 616.[24] Multiple courts of appeal agree. *See, e.g.*, *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 972 (9th Cir. 2021) ("[A]llegations that discrimination was a motivating factor behind a defendant's actions are essential to plead a disparate-treatment claim."); *Wind Gap*, 421 F.3d at 177 ("Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action."); *cf.* Modern Federal Jury Instructions (Sands) - Civil P 87.02, Instruction 87-29 ("[I]t is not necessary for the plaintiff to prove that discrimination on account of race was the only motivation for the deprivation; it is

---

[24] Emigrant asserts that the district court's reliance on *Arlington Heights* was misplaced because it "concerned a Fourteenth Amendment discrimination claim, not a claim under the FHA, ECOA, or NYCHRL." (Appellants' Br. at 50 n.29). This ignores that the Second Circuit has applied the *Arlington Heights* factors to FHA discrimination claims since at least 1979, holding since that time that the FHA is violated "if race is even one of the motivating factors" for a challenged action. *Robinson*, 610 F.2d at 1036–37, 1042; *see also MHANY*, 819 F.3d at 616.

enough if the plaintiff proves that motivation on the basis of race was at least a part of the motivation for the discrimination.").[25]

## V. **The NYCHRL Provides an Independent Basis for Affirmance**

Even if Emigrant had demonstrated prejudicial error in the jury instructions, which it has not, reversal would be improper. Here, the jury's separate finding that Emigrant violated the NYCHRL provides the necessary assurance that the verdict was not influenced by any claimed error in the disparate impact or disparate treatment instructions. *Chowdhury*, 746 F.3d at 50.

The New York City Council has amended the NYCHRL to create a "one-way ratchet" where federal law is "a floor below which the [NYCHRL] cannot fall." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). As the district court instructed the jury, (Tr. at 3093), the NYCHRL must be construed

---

[25] Emigrant is incorrect when it argues that a flaw in either the disparate impact or the disparate treatment jury instruction necessitates reversal under the general verdict rule. (Appellants' Br. at 41–42). This Circuit will not disturb a general verdict even if the jury was improperly charged on one theory if the Court can be "sufficiently confident that the verdict was not influenced by an error in the jury charge" because there was "adequate evidentiary support" for the other the intact theory. *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014) (citing with approval the First Circuit's practice to "generously appl[y] the harmless error concept to rescue verdicts where we could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support." (*Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30 (1st Cir. 2004))). As explained above, the trial record contains significant evidence supporting both the disparate treatment and disparate impact theories of liability. An error in one instruction is therefore harmless and should not result in reversal.

"broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)). To prevail on a disparate treatment claim, it requires only that a plaintiff show she was "treated less well, at least in part for a discriminatory reason." *Id.* at 110 n.8. To avoid liability, a defendant must prove that "discrimination played *no* role in its actions." *Id.* (alterations adopted) (emphasis in original) (citation omitted) (quotation marks omitted). Turning to disparate impact, a plaintiff prevails under the NYCHRL if she shows that "a policy or practice . . . results in a disparate impact to the detriment of any group protected by the [NYCHRL]," and the defendant "fails to plead and prove" the enumerated affirmative defense (which Emigrant has not asserted here). *Teasdale v. New York City Fire Dep't*, 574 F. App'x 50, 51–52 (2d Cir. 2014) (summary order) (quoting N.Y.C. Admin. Code § 8-107(17)(a)(1)–(2)).

Even if the Court were to agree with Emigrant that the district court erred in *both* its disparate treatment and disparate impact charges with respect to Plaintiffs'

federal claims, the asserted errors do not extend to Plaintiffs' NYCHRL claim.[26]

Any error related to the jury instructions is therefore harmless and this Court

should affirm.

## VI. The District Court Correctly Set Aside a Waiver of Claims in the Saintils' Loan Modification Because It Was Void as Against State and Federal Public Policy

At the conclusion of the trial, the jury awarded damages to six of the

Plaintiffs; the jury held that two Plaintiffs, the Saintils, had waived their claims by

signing a release provision that Emigrant included in a March 2010 mortgage

modification. (Dkt. 518). Following post-trial briefing, the District Court

concluded that the release provision in the Saintils' modification was contrary to

public policy and therefore unenforceable. (Dkt. 618, pp. 34–35). A *de novo*

review confirms this determination was correct, primarily because there is a clear

consensus against releases in mortgage modifications, but also when considering

the asymmetrical sophistication of Emigrant as compared to the Saintils.

Under both federal and New York law, a contract is unenforceable if it

contravenes public policy. *See In re Est. of Walker*, 476 N.E.2d 298, 301 (N.Y.

---

[26] To the extent that Emigrant argues in reply that the separate NYCHRL verdict required a separate instruction, any purported error would be harmless for two reasons. First, the jury *was* expressly instructed to construe this particular statute broadly. (Tr. at 3093). Second, because the NYCHRL is broader than federal law, the jury's finding of liability under federal law necessarily indicates the City law was violated.

1985); *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952); *Thomas James Assoc., Inc. v. Jameson*, 102 F.3d 60, 66 (2d Cir. 1996). This Court has admonished that courts "must not be timid in voiding agreements which tend to injure the public good." *Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73 (2d Cir. 1982). Articulations of public policy, such as those identified by the district court, may be found in laws, regulations, and industry guidance, even enactments and announcements that are passed or effective *after* an agreement is signed—or even after a suit is filed—but prior to the court's analysis. *See, e.g.*, *In re Est. of Walker*, 476 N.E.2d at 301–02 (court found controlling public policy in laws enacted well after the crucial events of the case had transpired, including death of the party); *Thomas James Assoc.*, *Baker v. F & F Inv.*, 339 F. Supp. 942, 944 (S.D.N.Y.), (public policy found in state statutes enacted after the crucial events at issue in the lawsuit), *aff'd*, 470 F.2d 778 (2d Cir. 1972); *DeGaetano v. Smith Barney, Inc.*, 983 F. Supp. 459, 468–69 (S.D.N.Y. 1997) (citing both "general principles of well-established federal policy" as well as "specific indications of relevant industry policy," the court identified and found controlling public policy in guidance issued after the motion at issue was filed); *Paolino v. Paolino*, 420 A.2d 830, 836 (R.I. 1980) (emphasizing that public policy may be found in post-agreement enactments, even those passed but not yet effective) (citing *Matter of Anonymous*, 401 N.Y.S.2d 438 (N.Y. Cnty. 1978),

which relied on a New York law that was enacted but not yet in effect at the time of the court determination).

Enactments in New York express a public policy that strongly disfavors, and even prohibit, the inclusion of any waiver or release of claims in mortgage modifications. New York banking regulations that specifically disallow a waiver of claims in modifications were published December 15, 2009—*prior* to the Saintils' modification—and have been effective since October 1, 2010, well before Mr. and Mrs. Saintil joined this lawsuit in 2012 to pursue their civil rights claims. *See* 3 NYCRR 419.7(j) ("A servicer shall not require a homeowner to waive legal claims and defenses as a condition of a loan modification, reinstatement, forbearance or repayment plan."); *see also* Dec. 15, 2009 Industry Announcement, dfs.ny.gov/legal/industry/ilmb091215a.htm (last visited May 18, 2023) (announcing regulations that prohibited waivers).

Similarly, federal law, regulations, and other indicia unambiguously pronounce a public policy consensus that renders void the waiver in the Saintils' modification. Amendments to the Truth in Lending Act passed in 2010 prohibit the enforcement of a "provision of *any* residential mortgage loan or of any extension of credit" that "bar[s] a consumer from bringing an action" for damages or relief under federal law, including under the FHA. *See* 15 U.S.C. § 1639c(e)(3). This codification reflects the federal government's consistent approach, across all

mortgage modification programs it implements or regulates, that waivers of legal claims may not be a term of a mortgage modification agreement. *See* FHA Single Family Housing Policy Handbook 4000.1, Section III.2.vii.E, entitled "No Waiver of Rights"; Fannie Mae Legal Documents New & Updates Archive (1999 – February 2022), 10 (describing January 2009 revisions to loan modification agreements to, *inter alia*, "remove any reference to borrowers waiving" their rights); Home Affordable Modification Program, Supplemental Directive 09-01, April 6, 2009, 2 ("The servicer may not require a borrower to waive legal rights as a condition of HMP").

Against this targeted and specific expression of public policy broadly prohibiting a waiver of claims as a term in a mortgage modification, Emigrant can offer only a judicial policy "in favor of settling disputes." Appellants cite to two cases—inapposite to the facts presented here—concerning highly sophisticated parties who, while represented by counsel, negotiated complex and individualized settlement terms, which one party then sought to set aside and relitigate. *Anita Founds., Inc. v. ILGWU Nat. Ret. Fund*, 902 F.2d 185 (2d Cir. 1990) (employers sought to set aside complex settlement with retirement funds after a court case clarified that negotiated terms were unfavorable); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 997 (2d Cir. 1983) (music executives and representatives of the estate of former Beatles musician George Harrison, all

represented by counsel, litigating over song royalties).[27] These cases have no

bearing on the waiver clause at issue, which was a form contract provided to

unsophisticated and unrepresented mortgage borrowers.[28]

Judge Johnson identified several additional sources of judicial policy that

also call into question the waiver in the 2010 modification. For example, a

contractual provision violates public policy where permits a party to "collect the

rewards of corruption. *Walters v. Fullwood*, 675 F. Supp. 155, 161 (S.D.N.Y.

1987). He also noted that courts must "give due consideration to the nature of the

contract and the circumstances" surrounding its execution, including the

sophistication of the parties and the disparity in bargaining power. *AXA Inv.*

*Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*, 890 F. Supp. 2d 373, 388

(S.D.N.Y. 2012); *see also Howard Johnson Int'l Inc. v. HBS Family, Inc.*, No. 96

CIV. 7687, 1998 WL 411334, at *8 (S.D.N.Y. July 22, 1998) (contract

unconscionable due in part to unequal bargaining power"). Here, the 2010

modification bears the hallmarks of unequal bargaining power that concerned the

courts in *AXA Inv. Managers UK Ltd.* and *Howard Johnson Int'l*. The unequal

---

[27] Emigrant's final case, *Rockmore v. Antell*, No. 07 Civ. 3592, 2008 WL 4443951 (S.D.N.Y Sept. 25, 2008), concerns the definition of duress, a factor not at issue here. The release in *Rockmore* was not in a mortgage modification and therefore did not implicate the sources of public policy that Appellees identify.
[28] Although Emigrant claims that the Saintils were "represented" by ACORN, this was not an attorney, but instead a community-based housing counselor who submitted documents on their behalf. (Tr. at 652–53).

position of these parties, one a sophisticated bank and the other unsophisticated homeowners in foreclosure, merely illustrates why both New York and federal law so highly disfavor the inclusion of waivers in mortgage modifications.

The 2010 waiver is void as against both New York and federal public policy; Judge Johnson was correct to decline to enforce it and, upon its own analysis this Court should do the same.

## CONCLUSION

For the reasons stated above, the Court should affirm the jury's verdict and the district court's post-trial order.

Dated: June 16, 2023                    Respectfully Submitted,

<u>/s/ Lila R. Miller</u>
Lila R. Miller
Tara Ramchandani
Yiyang Wu
Edward Olds
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036
Phone: (202) 728-1888
Fax: (202) 728-0848
lmiller@relmanlaw.com
tramchandani@relmanlaw.com
ywu@relmanlaw.com
tolds@relmanlaw.com

Rachel Geballe
BROOKLYN LEGAL SERVICES
105 Court Street, Fourth Floor
Brooklyn, NY 11201
(718) 237-5500
rgeballe@lsnyc.org

*Counsel for Appellees*

| | |
|---|---|
| SAINT-JEAN, *et al.*, | |
| Plaintiffs – Appellees, | **CERTIFICATE OF COMPLIANCE** |
| v. | |
| EMIGRANT MORTGAGE COMPANY, *et al.*, | Civil Action No. 22-3094 |
| Defendants – Appellants. | |

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Local Rule 32.1(a)(4)(A), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Rule 32(f), this brief contains 13,998 words. This certificate was prepared in reliance upon the word-count function of the word processing system (Microsoft Word 365 16.01.14931.20806 64-bit) used to prepare this brief. This brief complies with the typeface and typestyle requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using font size 14 Times New Roman.

Dated: June 16, 2023

/s/ Lila R. Miller
Lila R. Miller
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036
Phone: (202) 728-1888
lmiller@relmanlaw.com

*Counsel for Plaintiffs – Appellees*

| | |
|---|---|
| SAINT-JEAN, *et al.*,<br><br>       Plaintiffs – Appellees,<br><br>    v.<br><br>EMIGRANT MORTGAGE<br>COMPANY, *et al.*,<br><br>       Defendants – Appellants. | **CERTIFICATE OF SERVICE**<br><br>Civil Action No. 22-3094 |

I, Lila R. Miller, hereby certify under penalty of perjury that on June 16, 2023, the foregoing Page Proof Brief of Appellees was electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| Evandro C. Gigante<br>PROSKAUER ROSE LLP | Richard H. Klapper<br>Matthew A. Schwartz<br>SULLIVAN & CROMWELL LLP<br><br>    *Counsel for Defendants-Appellants* |

| | |
|---|---|
| Dated: June 16, 2023 | /s/ Lila R. Miller<br>Lila R. Miller<br>RELMAN COLFAX PLLC<br>1225 19th Street, N.W., Suite 600<br>Washington, DC 20036<br>Phone: (202) 728-1888<br>lmiller@relmanlaw.com<br><br>    *Counsel for Plaintiffs – Appellees* |